In re Estate of William R. Schultz, Deceased. Herbert C. Schultz and Marie P. Sternberger, Appellants, v. Chicago City Bank and Trust Company, Executor, et al., Appellees.

Gen. No. 42,171.

Hebel, J., dissenting.

Heard in the third division of this court for the first district at the February term, 1942. Opinion filed December 9, 1942.

Hummer, Van Ness & Yowell, of Chicago, for appellants; John J. Yowell and Herbert G. Bantz, both of Chicago, of counsel.

Rathje, Hinckley, Barnard & Kulp, of Chicago, for appellees; Francis E. Hinckley and Herbert C. Strauschild, both of Chicago, of counsel.

### Rehearing Opinion.

Mr. Presiding Justice Burke delivered the opinion of the court.

Toward the end of 1936 William C. Schultz, then over 67 years of age, retired from his position as a clerk at

the Chicago City Bank and Trust Company, 815 W. 63rd street, Chicago, after having worked for this bank and its predecessor for 19 years. He had been divorced for more than 20 years. He had two children, Herbert C. Schultz and Marie P. Sternberger, from whom he was estranged. He had lived alone in a rooming house and for 10 years he had lived in a small room at the Englewood Y. M. C. A. He did not have many friends or associate with many people and seemed to stay to himself. He enjoyed books and music. Upon his retirement the bank employees gave a dinner for him and presented him with a token of esteem. In the Spring of 1937 he took a trip to the west coast, having given up his room at the Y. M. C. A., and placed his personal effects in the home of his brother, Herman Schultz, 3008 S. Canal street, Chicago. These consisted of his papers, clothes, pictures, personal letters, a violin, his feather mattress and all other personal effects except what he carried in his suitcase. He considered his feather bed indispensible to his comfort. When he went west, he had no definite destination. His brother Herman died on July 2, 1937. William came from California to Chicago to attend the funeral. After the funeral he helped his sister-in-law, Pauline Schultz, to straighten out her affairs. He was born in Chicago and up to the time of making the trip to the west coast, had spent all of his life in that city. On July 16, 1937, while in Chicago, he made a will, describing himself as "William R. Schultz of the City of Chicago, County of Cook and State of Illinois." The third clause of the will reads:

"My children, Marie and Herbert, have not seen fit to visit me or to concern themselves about me for the last twenty years. I have therefore, come to the conclusion that they do not wish to have anything to do with me. It is, therefore, my express intention to disinherit them, and accordingly I have made no provision for them. They are not to participate in the distribution of my estate." He nominated the Chicago Bank and

Trust Company as executor. About the latter part of July 1937, he returned to California. He died at the El Rey Hotel in Los Angeles, California, on December 12, 1939. He had lived in California about 2½ years. The body was removed to Chicago, where it was interred. The will was admitted to probate by the probate court of Cook county and the bank qualified as executor. The will bequeathed the entire estate to the bank as trustee, and directed the payment to Pauline Schultz of $400 a year for her lifetime out of the income; directed that after her death the trustee distribute the entire trust estate then in its possession, together with all accumulations, equally between the Addison Manual Training School for Boys and the Addison Industrial School for Girls. These are Illinois corporations not for profit. The inventory filed by the executor showed there was no real estate and that the estate consisted of personal property. On June 17, 1941, Herbert C. Schultz and Marie P. Sternberger, being the son and daughter and the only heirs-at-law and next of kin of William R. Schultz, deceased, filed their petition in the probate court of Cook county, declaring that at the time their father made his will he was a resident of Chicago, Illinois; that shortly thereafter he moved to the State of California with the intention of making that State his permanent and only domicile; that he became a resident of California and made that State his permanent and only domicile, and continued to reside and be domiciled there until his death. The petition recited the provision of the Probate Act of California to the effect that no more than one third of any estate may be bequeathed or devised to any charitable or benevolent society or corporation, or in trust for charitable uses by a testator who leaves a spouse, brother, sister, nephew, niece or descendant or ancestor surviving him, who, under the will or the laws of succession would otherwise have taken the property so bequeathed or devised, and that if such devises and bequests shall exceed one

third of such estate then a pro-rata reduction shall be
made so as to reduce the aggregate thereof to one third
of the estate; and that all property bequeathed or de-
vised contrary to the provisions of this law shall go
to the descendants, etc., if and to the extent that they
would have taken the property but for such devises
or legacies. Petitioners prayed that California be
declared to be the domicile of William Schultz, de-
ceased; that distribution of the estate be made in accord-
ance with the law of that State, and that the bequests
to the Training School and Industrial School be reduced
so as not to exceed one third of the estate. The execu-
tor, the Training School and the Industrial School
answered, and denied that Schultz moved to the State
of California with the intention of making that State
his domicile, denied that he became a resident of Cali-
fornia or made it his permanent residence or domicile,
or that he was domiciled there at any time. The issue
thus joined was tried by the probate court, which entered
an order finding that at the time Schultz made his will,
and for many years before, he had been a resident of
Cook county, Illinois; that he had left Illinois on one
occasion and returned; that thereafter he left the State
and traveled to various places including Vancouver,
B. C., San Francisco, California, Long Beach, Cali-
fornia and Los Angeles, California, and that if he in-
tended to make California his domicile or become a resi-
dent of that State, he never consummated such intention
and did not become a resident of that State; that he did
not at any time abandon his domicile in Illinois, and that
he died domiciled in and a resident of Illinois. The
children appealed to the circuit court of Cook county,
where the matter was again tried. That court found
that Schultz was at the time of his death a resident of
and domiciled in the State of Illinois, and that the dis-
tribution of his estate was subject to the laws of Illinois
and as provided by his last will. The circuit court af-
firmed the judgment of the probate court and denied

the prayer of the petition. The children prosecute this appeal for the purpose of reversing the judgments of the circuit and probate courts.

The first question presented is whether the testator died domiciled in California, as contended by petitioners, or in Illinois, as contended by respondents. If he died domiciled in California, petitioners' position is that they may not be disinherited in favor of the schools to the extent of more than one third of the estate. We have read the cases cited by the parties on the subject of domicile, and find they are in substantial agreement. The parties disagree as to the application of these principles to the facts of the case. As a determination of the case depends in a large measure upon the facts, we have studied the transcript of the testimony and the exhibits closely. When William Schultz retired, he told William R. Crow, an attorney and one of his closest friends, that he would take a bus and was going to travel to the west coast and ride as far as he could each day until he got tired, and then he would stop off and look around at the scenery, and when he found a place he liked he was going to stay there. In bidding him good-bye, Crow told him that if he did not like it there that he would tell him about some places in Florida. Schultz said he would keep the suggestion in mind, and that when he came back he would have a talk with Crow. In April 1937, while on his way west, Schultz visited his cousin, Henrietta Kolbenschlag in St. Louis. He told her he did not know how long he was going to stay and whether he would make his permanent home in the west, or how he would like it, as he had never been there and did not know how he would find things. At the time of the death of his brother Herman in July 1937, he returned to Chicago. It was then that he made his will. The children concede that at this time William Schultz was a resident of and domiciled in Chicago. While in Chicago in July 1937, Crow saw Schultz in a restaurant and asked him where he was living. Schultz answered

that he was living in Long Beach, California, that he liked it so well that he did not think he would come back, that he would stay out in California since living conditions were reasonable and he met a great many people of his own age, having his taste for music, and that he was going to stay there. According to the testimony of Crow, Schultz also stated that he felt better in California than he felt in Chicago and that the climate agreed with him there. On this same trip to Chicago he told his cousin, Florence Much, whom he visited at her home in Riverside, Illinois that his going to California was to get away from the cold winters in Chicago. After the funeral of his brother and the making of his will, he returned to California. On his second trip to the west he wrote a postal card to his sister-in-law, Pauline Schultz, from Vancouver, B. C., on September 13, 1937, stating that he was there for a week. The next heard from him was a postal card from San Francisco dated November 1, 1937, stating that he would be there for a month, and that he had stopped at Seattle, Tacoma, Portland, Medford, Sacramento and Oakland. In both of these communications he noted that the weather was fine and that he was feeling fine. On December 7, 1937 he registered at the Hotel Cecil in Los Angeles, California, and stated upon the registration card that his residence was Chicago, Illinois. In January and February 1938 he communicated with the bank in Chicago with reference to some of his securities which had been placed in the safekeeping department of the bank at the time he left. He asked the bank to keep track of his income. His property consisted exclusively of personalty, a large part of which was notes secured by mortgages on real estate in Chicago, and he had opened a safekeeping account with his former employer, Chicago City Bank and Trust Company, 815 W. 63rd street, Chicago, the trust department of which serviced the mortgages. On January 28, 1938 O. L. Blake of the trust department wrote Schultz, advising him that an extension of

one of his mortgages had been requested. On February 2, 1938 Schultz replied on the back of the letter agreeing to an extension for 3 years, and stated: "I had fine weather up till now but it rains about every other day but I still got away from ice and snow." On February 12, 1938 he replied on the back of another letter from Blake and stated: "February has turned out to be one rain after another. As I have no overcoat with me I had to stick around the hotel." On February 21, 1938 Schultz wrote Blake: "The good old summer time is back again. Was down to the beach yesterday. People sunning themselves in bathing suits." On May 7, 1938, he registered at the Hotel Rolston, 332 American avenue, Long Beach, California, giving his residence as 815 W. 63rd street, Chicago. This was the address of the bank. Schultz had never lived there. On May 10, 1938 he sent a postal card to his sister-in-law saying: "Going to spend another year in California. Here for the summer at the Hotel Rolston. 332 American Avenue, Long Beach, California." Six days later he wrote a note to the same addressee saying: "I am staying in California another year. I will be here for some months. Will keep you posted if I move . . . Weather here is cooler than Los Angeles." He sent Pauline Schultz money for the care of the cemetery lot. On June 4, 1938, he sent a postal card to his cousin, Florence Much, from the same hotel in Long Beach, California, stating: "Expect to stay in California another year. Here for the summer. Write me if anything happens." On November 7, 1938 he registered for a room at $18 per month at the Hotel El Rey in Los Angeles. In registering at this hotel he gave his address as "Care 815 West 63rd St., Chicago, Ill." Pauline Schultz testified that William Schultz lived at the Hotel El Rey before coming to Chicago for the funeral of her husband. On November 23, 1938 Schultz wrote his sister-in-law to mail him his brown suit with both pants. He inclosed $1 and said: "If it

costs more will pay you when I see you next summer. Feeling fine.'' On December 14, 1938 he wrote Pauline from Los Angeles, acknowledging receipt of the suit, and said: ''Feeling fine. Had a week of hot weather, 85° to 92°.'' On December 27, 1938 he wrote Florence Much from the same hotel: ''I got back here November 7th. Had a swell summer in Long Beach. Came here because I thought it would be better in winter, . . . like June in Chicago. Feeling fine, outdoors every day.'' The following day he sent a New Year's card to his sister-in-law wishing her a Happy 1939. On May 6, 1939 he stated on a postal card to his sister-in-law: ''I am sick. In case anything happens I told them to notify you.'' On May 22, 1939 he wrote her: ''I was terribly sick. Doctor said I had a growth in my stomach. I am a little better but awful weak. I am coming back to Chicago as soon as I am able to travel, maybe two or three weeks,'' and in a postscript said: ''In case anything should happen to me, notify the bank.'' On June 24, 1939 he wrote to Blake of the Chicago City Bank and Trust Company: ''I am very sick and I think I will be three or four months in picking up my strength so I don't know when I will be back in Chicago. I am nothing but skin and bones and very weak. I have a doctor now who is doing me some good but at 70 I can't expect too much.'' On August 23, 1939 his cousin, Henrietta Kolbenschlag of St. Louis, and her husband visited Schultz at the El Rey Hotel in Los Angeles. He was in the lobby of the hotel. She spent the whole afternoon with him and had a long conversation. She testified that she had no interest in the law suit. She testified that she asked Schultz to come back to Chicago because he was in very poor health, but he said he liked the country out there so well and the climate agreed with him so he thought he would stay there; that she asked him to come back home, thinking he should be with relatives, or friends; but ''he said he felt that was his home and they were

very good to him at the hotel." Upon her return to St. Louis she wrote him, inclosing a self-addressed envelope for his reply. He replied on September 30, 1939 as follows:

"Dear Etta and Ben: Glad to hear you got home safe. The terrible hot spell pulled me down again then the last month I have been passing stones had to take enemas to get them out but the weather is nice now and I am hopeful that I will make up for lost time. Got my teeth in and they are fine. I can eat soft cooked meat, gums are not quite hard enough but I have no pain. I tried writing with pencil as it is better than the pens they got here. I am glad to hear from people but you know how lazy I am in answering so drop me a card once in a while. Will close with best regards to John. Again thanks for writing."

On October 3, 1939 he wrote Mrs. Much on the Hotel El Rey stationery as follows:

"I am slow in answering your letter but thought I might have little more cheerful news about myself. I am no better, very weak. In August had 4 days in bed with pleurisy that pulled me down, before that the doctor insisted in having my teeth pulled. I have false teeth now, that pulled me down. Last month I passed stones had to use enemas to get them out. Now I am hopeful that my troubles are over that I can start to build up. I can eat fairly well. I forgot to tell you we had a week of hot weather 107° one day that did me no good. I am still hoping for the best. Am staying here for the winter. Will close now with best regards to everybody."

On October 6, 1939, he wrote his sister-in-law, Pauline Schultz:

"Lena: I am not much better still very weak so I am staying here this winter so please send me the new overcoat, mail parcel post insure for $20 enclosed is $1 for expense it is the fuzzy one, black, for the last month I

have been breaking in my teeth I can eat pretty good so now I am hopeful that I pick up. I had a hard time with my bowels. Had stones passing through had to use enemas to get them out. Had a week of terrible hot weather that pulled me down some. I am sure glad to hear you are well for I never appreciated good health more than now when I am sick. Well will close now with best regards to everybody.''

The last statement of Schultz, so far as the record discloses, is a postal card to Pauline Schultz dated October 21, 1939, reading: "I got the overcoat. Thanks very much. Am a little better, not much. Regards to everybody.'' He had a small balance in a savings account in a Los Angeles bank, which was released by the inheritance tax department of California and remitted to the executor. He filed his income tax returns in 1937, 1938 and 1939 (for 1936, 1937 and 1938 respectively) with the Collector of Internal Revenue in Chicago and paid the tax by his checks drawn on the Chicago City Bank and Trust Company. On these returns he gave his address as Los Angeles, Cal. The record is silent as to whether he voted in California, nor does the record show whether or not he registered or voted in Illinois. The record is also silent as to whether he acquired any property in California. He apparently did not acquire any property or engage in any business there. It appears that he was retired and living from the income derived from his investments. The record does not show whether he affiliated with any social organizations or church in California, or as to whether he paid taxes there. At no time did he send for his books, violin, papers or the feather bed, which he prized so highly, all of which articles still remain in the custody of Pauline Schultz. He left his money on deposit with the Chicago City Bank and Trust Company. The safekeeping account in which he placed his securities is a service offered by the bank to

customers for the temporary custody of securities which they might want to leave while on a vacation or a trip abroad. Such service was not of a permanent nature. It was an agency. He opened this safekeeping account when he left Chicago. The bank's duties were to collect interest coupons and dividends and deposit them in accordance with his instructions.

The common-law rule that personal estate follows the person of its owner, and is distributed pursuant to the law of his domicile at the time of his death, is recognized as the law of this State. (*Cooper v. Beers,* 143 Ill. 25, 31.) Distribution must be made in accordance with the law of the domicile of the testator or of the intestate, as the case may be. (*Dickinson v. Belden,* 268 Ill. 105, 109.) In determining where Schultz was domiciled at the time of his death, we should keep in mind the definition of this word. The word "domicile" is derived from the latin "domus" meaning a home or dwelling house. Domicile is the legal conception of home and the term "home" is frequently used in defining or describing the legal concept of domicile. Domicile is the relation which the law creates between an individual and a particular locality or country. What has been said to be the most comprehensive and correct definition which could be given is that in a strict legal sense, the domicile of a person is the place where he has his true, fixed permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning. Domicile has also been defined as that place in which a person's habitation is fixed, without any present intention of removing therefrom, and that place is properly the domicile of a person in which he has voluntarily fixed his abode, or habitation, not for a mere special or temporary purpose, but with a present intention of making it his permanent home. Domicile has been defined in terms of its elements as residence at a particular place, accompanied by an intention, either positive or presumptive, to remain there permanently or for an indefi-

nite or unlimited length of time. While the terms "domicile" and "residence" are frequently used synonymously, they are not, when accurately and precisely used, convertible terms. That there is a difference in meaning between "domicile" and "residence" is shown by the fact that a person may have his residence in one place and his domicile in another. Whether the term "residence" used in a statute, will be construed as having the meaning of "domicile," or the term "domicile" construed as "residence" depends upon the purpose of the statute and the nature of the subject matter, as well as the context in which the term is used. It is a settled principle that every person must have a domicile somewhere. The common statement is that a person can have only one domicile at any given time. Domicile may be divided into domicile of origin, domicile of choice and domicile by operation of law. A person's domicile of origin is the domicile of his parents, the head of his family, or the person on whom he is legally dependent at the time of his birth. It is generally but not necessarily the place of his birth. A domicile of choice is the place which the person has chosen for himself to displace his previous domicile, but is based on the intention of the person. Domicile by operation of law is that domicile which the law attributes to a person, independently of his own intention or actual residence. It ordinarily results from legal domestic relations, as that of the wife arising from marriage. (28 C. J. S. Domicile, sec. 1.) In the case of *Kreitz v. Behrensmeyer,* 125 Ill. 141, our Supreme Court said (195):

"We have frequently held, that when a party leaves his residence, or acquires a new one, it is the intention with which he does so that is to control. Hence the shortest absence, if at the time intended as a permanent abandonment, is sufficient, although the party may soon afterwards change his intention; while on the other hand, an absence for months, or even years, if all the

while intended as a mere temporary absence for some temporary purpose, to be followed by a resumption of the former residence, will not be an abandonment. On the question of intention, the declaration of the party, though admissible, is not necessarily conclusive, because it may be disproved by his acts,—as thus: If a party were to remove his family to a particular district, there build and furnish them a home, keep his property there, return there constantly, as leisure allowed, and remain there with his family during sickness and unemployed time, this would constitute his residence, notwithstanding he might be employed in labor in another district, and claim that to be his residence, (*The People v. Holden,* 28 Cal. 124), for, on questions of domicile, less weight is given to the party's declaration than to his acts.''

Petitioners, asserting that William Schultz died domiciled in California, assumed the burden of proof, and maintain that they met the burden when they established that Schultz actually resided in California and died there. They argue that they proved that Schultz went to California the second time intending to stay there, and that shortly before his death he showed that he intended it to be his home. The United States Supreme Court recently held in *District of Columbia v. Murphy,* 314 U. S. 441, 62 Sup. Ct. 303, that ''the place where a man lives is properly taken to be his domicile until facts adduced establish the contrary.'' It there followed the leading case of *Ennis v. Smith,* 55 U. S. 400, involving the domicile of the Polish patriot, Kosciusko. General Kosciusko, born in Poland, served with distinction in the American Army in the Revolutionary War and later lived in France. He died leaving assets in this country undisposed of and it became important to determine the jurisdiction in which he was domiciled. The court said (423):

''Where a person lives, is taken *prima facie* to be his domicile, until other facts establish the contrary.

. . . . But when there is a removal, unless it can be shown or inferred from circumstances that it was for some particular purpose, expected to be only of a temporary nature, or in the exercise of some particular profession, office or calling, it does change the domicile. The result is, that the place of residence is *prima facie* the domicile, unless there be some motive for that residence not inconsistent with a clearly established intention to retain a permanent residence in another place.''

The court further declared that the burden of proof is upon him who asserts that the domicile of origin has been changed, but where a person lives is taken *prima facie* to be his domicile and where that is different from the domicile of origin, this casts upon him who denies the domicile of choice the burden of disproving it. Section 10551 of the California Health and Safety Code provides that a copy of the record of a death, when properly certified by the State or local registrar to have been registered within the period of one year from the date of the event is *prima facie* evidence in all courts of the facts stated therein. Section 10375 of the same code prescribes the contents of a death certificate. The certificate of the death of William Schultz, certified under the Great Seal of the State by the Secretary of State of California who is charged by section 407 of the Political Code of California with the custody of the Great Seal, shows that the decedent's residence was 511 E. 6th street, El Rey Hotel, Los Angeles, California, and that the length of his residence in the city where he died was two years and five months, and that the length of his residence in California was the same. The California statute is similar to section 20 of our Public Health Act (sec. 55, ch. 111½, Ill. Rev. Stat. 1941 [Jones Ill. Stats. Ann. 12.23]) which provides that any such certification of a death, when properly certified to by the State Board of Health or the local registrar or the county clerk, shall be *prima facie* evidence in all courts and places of

the facts therein stated. Respondents cite *Howard v. Illinois Trust & Savings Bank*, 189 Ill. 568; *Henninger v. Inter-Ocean Casualty Co.*, 217 Ill. App. 542; *Spiegel's House Furnishing Co. v. Industrial Commission*, 288 Ill. 422, and argue that the death certificate proves no more than the fact that Schultz died at 511 E. 6th street, Los Angeles, California on December 12, 1939, and that it cannot be given any greater effect. In the *Howard* case the court held that it was error to admit a birth certificate for the purpose of proving that a child was the second child of the mother. The court said (572):

"Registers of births, deaths and marriages made pursuant to the statute and within its requirements are admissible in evidence to prove the facts recorded. On account of the credit due to the officials empowered to record the facts in the public interest, such registers are evidence of the facts without the usual tests of truth."

It appears that the death certificate prescribed by the laws of California and Illinois follow the Federal Census Bureau's standard form for a death certificate. Section 7 of the Public Health Act of Illinois (sec. 42, ch. 111½, Ill. Rev. Stat. 1941 [Jones Ill. Stats. Ann. 12.07]) provides that "the certificate of death shall contain at least the items of the Standard Certificate of Death, approved and adopted by the United States Bureau of the Census. The personal particulars shall be authenticated by the signature and address of the informant who shall be the nearest of kin or other competent person acquainted with the facts. The medical certificate shall be made and signed by the legally qualified physician, if any, last in attendance, or by the coroner." The standard form for death certificate was used in the case of William Schultz, which shows the place of his death as 511 E. 6th street, El Rey Hotel, Los Angeles, California; his residence at the same place; that he was divorced; that the name of his divorced wife was Anna

Ansell; that he was 70 years, 6 months and 2 days old; that he was a bank clerk; that his place of birth was Chicago; that his father's name was Ernest Schultz and his mother's name was Julia Dryer; that both parents were born in Germany; that the body was removed to Chicago for burial and that Mrs. Pauline Schultz, 3008 S. Canal street, Chicago, was the informant. Apparently, Pauline Schultz gave the information by long distance telephone. In the *Henninger* case the death certificate was admitted in evidence. The only thing stricken from the certificate was the words ''made by garter buckle July 12,'' there being no evidence that the deceased ever wore a garter. This statement constituted a conclusion and also a matter not required by the statute to be in the death certificate. The *Spiegel's* case involved the admission of the findings of the verdict of a coroner's jury. The Supreme Court held that the coroner's verdict was not admissible to establish the cause of death in a proceeding under the Workmens' Compensation Act. It will be observed that the death certificate is divided into two parts, the part giving the personal particulars required to be signed by the informant, together with his or her address, and the part giving information as to the cause of death, etc., which is required to be signed by the ''legally qualified physician, if any, last in attendance, or by the coroner.'' This is in accordance with section 7 of the Public Health Act of Illinois (sec. 42, ch. 111½, Ill. Rev. Stat. 1941 [Jones Ill. Stats. Ann. 12.07].) It appears that the California law is the same as the law of Illinois on this subject. The death certificate in the instant case purports to be signed by Mrs. Pauline Schultz, 3008 S. Canal street, Chicago, who is shown as the informant as to the personal particulars. Mrs. Schultz testified that a short time after William died, she (in Chicago) had a telephone conversation with the funeral director in Los Angeles. The record is silent as to what was said in the conversation. In the trial she

was not asked whether she told the funeral director that William had resided in Los Angeles for two years and five months previous to his death, and the funeral director did not testify. Apparently, he took the liberty of signing Mrs. Schultz's name as the informant. In the telephone conversation she undoubtedly directed that the body be sent to Chicago. In the state of the record we would not be justified in finding that Mrs. Schultz signed the death certificate, or that she stated in the telephone conversation that William had been a resident of Los Angeles for two years and five months. It is clear that section 10551 of the California Health and Safety Code, making a properly certified record of a death *prima facie* evidence in all courts of the facts therein stated, contemplates that the persons giving the information shall have some knowledge of the facts stated in the certificate. The personal particulars are required to be authenticated by the signature and address of the informant, who shall be the nearest of kin, or other competent person acquainted with the facts, and the medical certificate shall be made and signed by the legally qualified physician, if any, last in attendance, or by the coroner. For these reasons we uphold the contention of appellants that the death certificate proves no more than the fact that Schultz died at 511 E. 6th street, Los Angeles, California on December 12, 1939, and that the cause of his death was as stated above the signature of the physician in attendance. In considering the case, we are ignoring the personal data supposedly supplied by Mrs. Pauline Schultz.

The evidence shows that when Schultz left Illinois in the Spring of 1937, he intended to travel to the west coast and to stop off at various places and look around at the scenery, and that when he found a place he liked he was going to stay there. When he returned for his brother's funeral he told his friend Crow that he was living in Long Beach, California, and that he liked it

so well he did not think he would come back; that he would stay in California; that the prices and living conditions were reasonable; that he met a great many people of his own age, having his taste for music, that he enjoyed the concerts at Long Beach and that he was going to stay there. He also said he felt well in California and that the climate agreed with him. The evidence also shows that when he returned to California in the Summer of 1937, he intended to remain there. He had given up his place of abode in the Y. M. C. A. where he had lived for 10 years. On arriving in California he lived there continuously for more than two years and was in his third year, when he died. The weather meant much to him. He told his cousin Florence Much that his going to California was to get away from the cold winters. He found he could live in a rented room in Los Angeles as cheaply as he could in Chicago. The testimony of his cousin Henrietta Kolbenschlag when she and her husband visited him about four months before his death, is uncontradicted. She testified that he liked the country out there so well and the climate agreed with him so that he thought he would stay there. He also told her (referring to California) that that was his home and that they were very good to him at the hotel. It is apparent that he did not go to California for a temporary purpose, or to carry out a commission, nor did he go to receive medical attention. He had no family fireside or ties of affection to bring him back to Chicago. He retired from business and had enough income to live without working. He liked the California climate and complained of the Chicago winters. As tending to show that he was not domiciled in California, we have considered that in registering at hotels he gave his address as Chicago, and that he also wrote postal cards and letters indicating an intention to return to Chicago. The notes which he sent to his relatives and friends in which he disclosed an intention to return to Chicago show in our opinion that he intended to visit Chicago. The evidence is convincing

to us that he liked southern California, and his action in living there continuously for more than two years is very strong evidence that he intended that State to be his permanent home. That fact, coupled with the statement that he made to Mr. Crow and his cousin Florence Much while in Chicago, and to his cousin Henrietta Kolbenschlag in Los Angeles, together with the fact that he gave up his room at the Y. M. C. A., convinces us that the petitioners have established by a preponderance of the evidence that at the time of his death, Schultz was domiciled in California. When he first visited California in the Spring of 1937, he went to look around. Apparently, he was very much impressed by this visit and made up his mind to live there. He so stated while in Chicago, following the death of his brother. He carried out that intention by returning there. He did not come back to Chicago. His statements and his actions clearly show that he intended to remain permanently in California. After having made his permanent residence in California, that State became his place of domicile notwithstanding he may have entertained a floating intention to return to his former domicile in Chicago at some future period. In *Gilbert v. David*, 235 U. S. 561, the court said (569):

"If a person has actually removed to another place, with an intention of remaining there for an indefinite time, and as a place of fixed present domicile, it is to be deemed his place of domicile, notwithstanding he may entertain a floating intention to return at some future period."

We have also considered the fact that Schultz filed his income tax returns with the Collector of Internal Revenue at Chicago. This is counter-balanced by the fact that on these returns he gave his address as Los Angeles, California. We have also considered that he opened a safe keeping account with the bank where he had been employed, and that this is usually of a tem-

porary nature. At the time he opened the account he intended to go west and determine whether he liked the country. His assets consisted largely of mortgages on real estate in Chicago and vicinity, and it was quite natural that he should select a Chicago bank in which he had confidence to service these mortgages. We have considered that he moved his personal belongings, such as his papers, clothing, violin and his feather bed to the home of his sister-in-law. Later, however, he sent for the clothes he needed. Despite the fact that the evidence shows that his feather bed was indispensible to his comfort, he did live in California for over two years without it, and there is not a scintilla of evidence that he suffered any inconvenience without it. He liked to live in Long Beach in the summer and in Los Angeles in winter, and he may not have wished to move the feather bed back and forth between these two points. An examination of the record satisfies us that the petitioners have maintained the burden which they assumed in proving that at the time of his death, William Schultz was domiciled in California, and we so find.

The executor states that the effect of an order admitting a will to probate is to transfer the personal estate as therein provided, and the situs is where the instrument evidencing the indebtedness, stock or chose in action happens to be, and quotes from section 53 of the Administration of Estates Act of Illinois (sec. 205, ch. 3, Ill. Rev. Stat. 1941 [Jones Ill. Stats. Ann. 110.302]) that every will when admitted to probate as provided by that act is effective to transfer the real and personal estate of the testator devised and bequeathed therein. The executor asks that since there was no appeal from the order admitting the will to probate, it is final and binding upon all and the title to the property became vested in the bank as trustee for the purpose established by the will, and points out that section 55 of the same act (sec. 207 [Jones Ill. Stats. Ann. 110.304]) provides that the situs of intangible personal estate of nonresi-

dents is where the instrument evidencing the debt, obligation or chose in action happens to be, and that Mr. Schultz's entire estate consisted of money in the bank in Chicago, mortgages, bonds and stock, all of which were in the custody of the bank continuously up to the time of his death and are still there. In support of this contention the executor discusses the case of *Johns Hopkins University v. Uhrig,* 145 Md. 114, 125 Atl. 606. In our opinion that case is not applicable to the factual situation before us. It was decided under a Maryland statute, which provided that every will executed out of the State should have the same force and effect as if executed in the mode required by the laws of Maryland, and that "if the testator was originally domiciled in Maryland, although at the time of making the will or at the time of his death he may be domiciled elsewhere, the will should be admitted to probate and when so admitted then it should be governed by and construed and interpreted according to the law of Maryland without regard to the *lex domicilii,* unless the testator shall expressly declare a contrary intention." In their reply brief and in the oral argument petitioners (the children) pointed out that in August 1940, at the time they filed their petition in the probate court, they also filed a complaint against respondents in the circuit court, in which they alleged that on February 26, 1940, and within nine months of the date of the filing of said complaint, the probate court of Cook county admitted to probate the last will and testament of William R. Schultz, deceased, and issued letters testamentary to the bank, and setting up substantially the same facts and praying substantially the same relief as prayed in the probate court; that respondents moved to dismiss the circuit court suit on the ground that the bank was the duly appointed executor, and was acting as such in the probate court; that "there is now pending and undisposed of a petition in the Probate Court entitled in the same estate and filed by plaintiffs herein on or about

the 27th day of August, 1940, in and by which they set forth substantially the same matters alleged in their complaint herein, and pray substantially the same relief as they prayed in their complaint in this cause''; and further that ''under the laws and statutes of the State of Illinois the Probate Court has exclusive jurisdiction of the probate of wills and the administration and distribution of the estates of deceased persons, and there is, therefore, another action pending between the same parties for the same cause''; that after the entry of the judgment involved in the instant appeal, respondents filed an additional ground for dismissal of the circuit court suit, namely, that ''the matters set forth in the complaint in this cause have been finally adjudicated and determined between the parties hereto by a court of competent jurisdiction of the parties and subject matter''; and that on December 26, 1941 the circuit court dismissed the cause in conformity with that motion. The record before us shows that petitioners and respondents submitted the case to the probate and circuit courts on the issue as to whether William R. Schultz was domiciled in California at the time of his death. We are of the opinion that the provision of section 53 (sec. 205) of the Administration of Estates Act that every will admitted to probate is effective to transfer the real and personal estate of the testator devised and bequeathed therein, contemplates that such transfer is subject to change in accordance with any appropriate judgment thereafter entered in a court of competent jurisdiction. In considering this phase of the case, it is well to remember that petitioners do not contend that testator was of unsound mind or that undue influence was exercised when the will was made, nor that the will was not executed with the formalities required by law. Hence, appealing from the order of the probate court admitting the will to probate, would not decide the issues that were raised by the petition and answer. No distribution has been made by the bank as

executor to the bank as trustee. It is obvious that the parties recognized the jurisdiction of the probate court to enter an appropriate order respecting the distribution of the estate in accordance with the will and the law of the domicile of the testator.

Finally, respondents maintain that petitioners could not take any part of the estate under any circumstances except by intestacy. They point out that section 41, Article II of the Probate Act of California provides that all property bequeathed or devised contrary to the provisions of that section, shall go to the spouse, brother, sister, nephew, niece, descendant or ancestor of the testator if and to the extent that they would have taken the property but for such devises or legacies, and emphasize the words ''if and to the extent that they would have taken said property as aforesaid but for such devises or legacies.'' They point out and we agree that Schultz manifested a clear intention not to leave any part of his estate to petitioners. Respondents insist that it is thus apparent that petitioners would not have taken any part of the estate under any circumstances, and support their argument by citing *In re Dwyer's Estate,* 159 Cal. 680, 115 Pac. 242. We have read that case and do not consider it applicable to the facts before us. In the case of *In re Layton's Estate,* 217 Cal. 451, 19 P. (2d) 793, the Supreme Court of California had under consideration the provisions of the Probate Code of California relating to charitable bequests. The decedent died in Los Angeles and his will was admitted to probate there. The daughter of the decedent was expressly disinherited and it was provided in the will that the portion of the testator's estate that might be held to have been devised in contravention of law should go to his living heirs-at-law, excluding his daughter. The wife claimed that since she was one of the living heirs and that the daughter was excluded, she, the wife, should have the entire estate above the one third to which the charitable institution was entitled,

but the court construed the will to mean his collateral heirs and treated his daughter who had been disinherited as if she did not exist and he had died leaving only his wife and collaterals. It will be noted, however, that the *Layton* will not only expressly disinherited his daughter, but provided that any portion of his estate that might be held to have been bequeathed in contravention of law should go to his living heirs-at-law, excluding his daughter. Obviously, if the charitable bequests were in contravention of law, there was no intestacy so as to let the daughter in, but a valid bequest to the heirs-at-law other than the daughter. In the instant case, however, no such provision is made, and as there is a partial failure of the gift to charities, there is an intestacy as to such part. We agree that such part must go in accordance with the law of inheritance of the State of California.

In their petition for rehearing appellees state that "we overlooked the fact that Pauline Schultz, the life beneficiary, is entitled to an annuity of $400 a year as long as she lives, and that the distribution intended by the testator was to take effect upon her death. Consequently, the entire estate was not bequeathed to the schools. If two-thirds of the estate is to descend and be distributed as intestate, then the schools will receive less than one-third and their shares will be diminished by the payment of the annuity to the life beneficiary as long as she may live. . . . Under the views expressed by the court in its opinion and its interpretation of the law of the State of California the schools are entitled to receive no less than one-third of the estate and under the remanding order their share will be substantially less than one-third of the estate, and maybe nothing at all. . . . We think that under the views expressed by the court in its opinion the schools are entitled to one-third of the estate and that the present value of one-third of the estate may be substantially more than the amount remaining in the

trust at the time of the death of the life beneficiary." In their answer to the petition for rehearing, appellants state that "we agree that the charities should receive one-third of the estate, without reduction by payments to the annuitant. She is now 76 years old. Her right to the $400 annuity has never been questioned. The value of the estate is thirty odd thousand dollars. If necessary to avoid any possibility that the remanding order might be construed in a manner contrary to the wishes of all parties, we join in the prayer that the court modify its opinion to the extent that the remanding order will be effective to accomplish the results contemplated in the opinion of the court. . . . We agree that the remanding directions should require that two-thirds of the estate less an amount sufficient to provide for payment of the annuity to Pauline Schultz without reducing the one-third to be paid to the charities, shall descend and be distributed as intestate estate in accordance with the opinion of the court." It will be noted that the will provides that "the trustee, out of the net income of the trust estate, shall pay to Pauline Schultz, widow of my deceased brother, Herman Schultz, the sum of $400 a year in convenient installments, and such payments of $400 a year shall continue for and during the lifetime of the said Pauline Schultz." The will further provides that "after the death of Pauline Schultz, the trustee shall pay, distribute and deliver the entire trust estate then in its possession, together with any and all accumulations thereon, to the following corporations in the following proportions, to wit: to Addison Manual Training School for Boys, an Illinois corporation not for profit, a one-half part thereof, and to Addison Industrial School for Girls, an Illinois corporation not for profit, a one-half part thereof." In our previous opinion in reversing the judgment of the circuit court, we remanded with directions to enter an order and judgment that at the time of his death William R.

Schultz was domiciled in California; that the bequest to the trustee of one half of the estate to the Addison Manual Training School for Boys and one half to the Addison Industrial School for Girls be so reduced that the aggregate thereof shall not exceed one third of the entire estate, as required by the laws of California; that two thirds of the estate shall descend and be distributed as intestate estate in accordance with the laws of California, and for further proceedings not inconsistent with this opinion. The reason we did not give any directions relative to the annuity to Pauline Schultz was that there was no dispute between the parties as to her rights. Consequently, the direction "for further proceedings not inconsistent with this opinion" gave full authority to the circuit court to enter appropriate orders providing for the annuity to Pauline Schultz. However, in view of the suggestions contained in the petition for rehearing and the answer thereto, we are amplifying the remanding order. The judgment of the circuit court of Cook county is reversed and the cause remanded with directions to enter an order and judgment that at the time of his death, William R. Schultz was domiciled in California; that the trustee pay to Pauline Schultz out of the net income of the trust estate the sum of $400 a year in convenient instalments commencing with December 12 1939, and continuing during her lifetime; that two thirds of the estate, less an amount sufficient to provide for payment of the annuity to Pauline Schultz without reducing the one third to be paid to the schools, shall descend and be distributed as intestate in accordance with the law of California; that the bequest to the trustee of one half of the estate to the Addison Manual Training School for Boys and one half to the Addison Industrial School for Girls, be reduced so that each school will receive one sixth of the estate, without reduction because of the annuity to Pauline

Schultz, and for further proceedings not inconsistent with this opinion.

*Reversed and remanded with directions.*

KILEY, J., concur.

MR. JUSTICE HEBEL dissents and does not concur with the conclusion reached by the majority opinion of this court in finding that William R. Schultz, deceased, was domiciled in California at the time of his death, nor with the conclusion that by reason thereof the bequest to the trustee of one half of the estate to the Addison Manual Training School for Boys and one half of the estate to the Addison Manual Training School for Girls be so reduced that the aggregate thereof shall not exceed one third of the entire estate, as required by the laws of the State of California, and that two thirds of the estate shall descend and be distributed as intestate estate in accordance with the statutory laws of California. (Section 41, Article II, Probate Act of California, amended by statute 1939, ch. 334 T. R. 79.) The California Probate Act provided in substance that no more than one third of any estate may be bequeathed or devised to any charitable or benevolent society or corporation, or in trust for charitable uses by a testator who leaves a spouse, brother, sister, nephew, niece or descendant or ancestor surviving him, who under the will or the laws of succession would otherwise have taken the property so bequeathed or devised, and that if such devises and bequests shall exceed one third of such estate then a pro-rata reduction shall be made so as to reduce the aggregate thereof to one third of the estate, and that all property bequeathed or devised contrary to the provisions of this law shall go to the descendants, etc., if and to the extent that they would have taken the property as aforesaid but for such devises or legacies.

Upon this subject the Supreme Court of Illinois, in the case of *Fowler v. Lamson*, 146 Ill. 472, said upon the

question of whether a law of one State can be enforced by a State other than the State of the *lex loci,* as follows:

"... It is well settled that these special remedies having been provided for the enforcement of the individual liability of stockholders created by the laws of Kansas, they alone can be pursued to enforce that liability. (*Fourth Nat. Bank v. Francklyn,* 120 U. S. 747, and cases cited in note; 3 Am. S. R. 854; Thompson on Liability of stockholders, sec. 56; Cook on the Law of Stock and Stockholders, sec. 219.) The reason of this rule is manifest. The liability only exists by force of some constitutional or statutory provision, and the person incurring that liability is presumed to do so subject to its enforcement by the special provision made for that purpose, and no other. *Lowery et al. v. Inman,* 46 N. Y. 119, and authorities cited.

"The amended bill in this case proceeds upon the allegation that the corporation has been dissolved, but attempts to enforce the individual liability of the defendants by a proceeding entirely different from that prescribed by the statute of Kansas, and thus deprive the defendants of the speedy and adequate remedy given them by that statute against other stockholders, if they should be held liable. There is also the further insuperable objection to this proceeding that it is an attempt to enforce the individual liability of the defendants in a jurisdiction other than that in which the corporation exists, the rule being, that when a special remedy is given creditors of a corporation against its stockholders, the liability cannot be enforced in another State. (*Lowery v. Inman, supra; Christenson v. Eno,* 106 N. Y. 97; *Minnick v. Mings Iron Works Co.,* 25 W. Va. 184.) The reason for this rule is forcibly illustrated by the above quoted statute of Kansas providing a remedy in case of the dissolution of a corporation, which remedy, it must be conceded, could only be enforced in the State of Kansas, where, presumably, the stockholders of the corporation generally reside."

In the case of *Lust v. Atchison, T. & S. F. Ry. Co.,* 267 Ill. App. 60, the court held that where a statute of a State creates a new right and also provides a special remedy, such right will not be enforced in another State where the remedy is unknown. Therefore, upon the question involved, as to the enforcement of the statutory remedy afforded by the California special statute, it is my opinion that the special statute cannot be enforced in this State.