## DISTRICT OF COLUMBIA v. MURPHY.*

No. 58.   Argued November 17, 1941.—Decided December 15, 1941.

---

* Together with No. 59, *District of Columbia* v. *DeHart*, also on writ of certiorari, 313 U. S. 556, to the Court of Appeals for the District of Columbia.

442

*Mr. Glenn Simmon,* with whom *Messrs. Richmond B. Keech* and *Vernon E. West* were on the brief, for petitioner.

444

*Mr. Harry Raymond Turkel* for respondents.

Mr. Justice Jackson delivered the opinion of the Court.

These cases, which have been argued together, differ somewhat in facts, but each involves a controversy as to whether respondent was domiciled within the District of Columbia on December 31, 1939, within the meaning of § 2 (a) of the District of Columbia Income Tax Act,[1] which lays a tax on "the taxable income of every individual domiciled in the District of Columbia on the last day of the taxable year." The following facts appear from proceedings before the Board of Tax Appeals for the District of Columbia:

The respondent in No. 58, a single man, first came to the District of Columbia in 1935 to work as an economist in the Treasury Department, and was blanketed into Civil Service in that position in July, 1938. He came here from Detroit, Michigan, and has ever since continued to

---

[1] 53 Stat. 1087; 20 D. C. Code (Supp. V, 1939) § 980 (a).

be a registered voter and has voted in the elections and primaries in Wayne County, Michigan. He was born in New London, Connecticut, in 1905, and when five years old moved with his parents to Los Angeles, California, where he resided until 1926, when he removed to Berkeley, California. His parents live in California. In 1929 he completed his studies at Brown University and immediately thereafter accepted employment in a trust company in Detroit, Michigan, of which one of his former professors at Brown was vice president. While in Detroit, respondent lived first in a rooming house and later in an apartment. He owns no property there. In the District of Columbia he lives in an apartment, which he has furnished himself. His present employment pays him $6,500 a year, while that which he left in Detroit paid but $6,000. He testified before the Board of Tax Appeals that he does not think he would improve his condition by returning to Detroit, but that "It is the place to which I will return if I ever become disemployed by the Government, which I hope will not happen . . ." Although he has no present connection with the trust company, he believes that he could go back with it if he should return to Detroit. If a better position than he now has should be offered in a city other than Detroit, he "very likely would" accept it, despite a "preference for Detroit" based on a belief that he "would fit in more easily" there.

Respondent claimed that Detroit was his "legal residence" and that he was not domiciled in the District of Columbia. The Board of Tax Appeals for the District of Columbia found "as a fact" that when he came to Washington in 1935 he "had an intention to remain and make his home in the District of Columbia for an indefinite period of time; and that such intention has ever since, and still does remain with him; and that if he has any intention to return and make his home in Detroit, it is a floating intention." The Board held, however, "as

matter of law," that on December 31, 1939, the last day of the taxable year, petitioner was not domiciled in the District of Columbia, believing that it was compelled to do so by the decision of the United States Court of Appeals for the District of Columbia in *Sweeney* v. *District of Columbia,* 72 App. D. C. 30, 113 F. 2d 25, certiorari denied, 310 U. S. 631.

The respondent in No. 59 lived in the District of Columbia for twenty-six years after coming here from Pennsylvania in 1914 to accept a clerical position of indefinite tenure under Civil Service in the Patent Office. He was then on a year's leave of absence from a railroad by which he was employed, but continued in the Civil Service to the time of hearing, becoming Chief Clerk of the Personnel and Organization Division of the National Guard Bureau, War Department, with offices in Washington. Single when he came, in 1917 he married a native of Washington, who died in 1935 without children. Shortly after their marriage the couple purchased as a home, premises at 1426 Massachusetts Avenue, S. E., in the District of Columbia, in which respondent still lives. In about 1925, he purchased a lot at "Selby on the Bay" in nearby Maryland, and before his wife's death he bought a building lot in the District of Columbia, acting on his wife's pleas for a summer place and a better residence. He agreed with his wife that, on his retirement, six months would be spent at Selby. He testified that he never desired to purchase the lot in the District of Columbia, but did so at the insistence of his wife. He put a "For Sale" sign on it when she died, and both lots, which he still owns, are up for sale. He has deposits in three Washington financial institutions and owns first trust notes on property located in Maryland and Virginia.

In 1915, respondent became a member of a Lutheran church in Washington, and has ever since been an active member, at one time serving as president of its Christian

Endeavor Society. He is a contributor to Washington charities, a member of the Motor Club of Washington, and of the Washington units of ."Tall Cedars of Lebanon" and the "Mystic Shrine," both identified with free-masonry. He has filed his federal income-tax returns with the Collector of Internal Revenue at Baltimore, and always paid to the District of Columbia an intangible property tax while that tax was in effect.

Respondent had resided in Pennsylvania from birth until he left for Washington. He claimed as his "legal residence" the residence of his parents in Harrisburg, where they still keep intact his room in which are kept some of his clothes and childhood toys. Though paying nothing as rent or for lodging, he has from time to time made presents of money to his parents. He has visited his parents' home in Harrisburg over week ends at least eight times a year, and has been there annually between Christmas and the New Year. A registered voter in Pennsylvania, he has voted in all its general elections since he became of age. He paid the Pennsylvania poll tax until it was superseded by an occupational tax, which he has also paid. Payment of such taxes was a prerequisite to voting.

In 1912, respondent became a life member of the Robert Burns Lodge No. 464, Free and Accepted Masons, and of the Harrisburg Consistory, Scottish Rite, both Masonic bodies. While he resided in Harrisburg he was a member of the Bible Class of the Pine Street Presbyterian Church, which he still attends on visits there, and to which he made substantial contributions in 1939. He owns jointly with his father a note secured by a mortgage on Pennsylvania real estate. Respondent testified that he expected to retire from Civil Service in four years and intended then to sell his house and "leave Washington."

The Board found "as a fact" that, at the end of one year after he came to the District in 1914, respondent "had an

intention to remain and make his home in the District of Columbia for an indefinite period of time and that intention remained with him, at least until the death of his wife." As in No. 58, it considered itself bound by the *Sweeney* case, *supra,* and accordingly held "as a matter of law" that the petitioner was not domiciled in the District on December 31, 1939, and never had been.

The decisions in both cases were affirmed on review by the United States Court of Appeals for the District of Columbia. 73 App. D. C. 345, 347, 119 F. 2d 449, 451. The cases were brought here on writs of certiorari because of the importance of the questions involved. 313 U. S. 556.

Although the District of Columbia Income Tax Act made "domicile" the fulcrum of the income tax, the first ever imposed in the District, it set forth no definition of that word. To ascertain its meaning we therefore consider the Congressional history of the Act, the situation with reference to which it was enacted, and the existing judicial precedents, with which Congress may be taken to have been familiar in at least a general way. *United States* v. *Dickerson,* 310 U. S. 554, 562.

As introduced into and passed by the House of Representatives, the bill which, with amendments, became the Act, laid a tax upon income of residents from whatever source derived, and upon income of nonresidents from sources within the District, with a provision for credit for the payment of income taxes elsewhere. H. R. 6577, 76th Cong., 1st Sess., §§ 2 (a), 4 (a), 9 (a), (b). The bill was amended on the floor of the House to except "Senators, Representatives, Delegates, Resident Commissioners, officers and employees of the Senate and House of Representatives of the United States." 84 Cong. Rec. 7036. It was unacceptable to the Senate in this form, and it was agreed in conference that the tax should be levied upon "every individual domiciled in the District of Columbia

on the last day of the taxable year," with no provision for credit for income taxes paid elsewhere. H. R. Rep. Nos. 1093, 1206, 76th Cong., 1st Sess., p. 3; Sen. Doc. No. 92, 76th Cong., 1st Sess., p. 3. This was agreed to by the Senate and by the House of Representatives, and became part of the Act under consideration.

The conference agreement was presented to the Senate by Senator Overton, chairman of the Senate conferees, with the following explanation: "Mr. President, I now call attention to the fact that the individual income tax is imposed only on those domiciled in the District of Columbia. It, therefore, necessarily excludes from its imposition all Senators and Members of the House of Representatives, the President of the United States, all Cabinet officers, and Federal employees who have been brought into the District from the various States of the Union to serve their country in the National Capital, provided such employees have not of their volition surrendered their domiciles in the States and have voluntarily acquired domiciles within the District of Columbia." 84 Cong. Rec. 8824. Senator Overton also stated: "I took the position before the District of Columbia Committee and in conference that I would not support any legislation which would exempt Senators and Members of the House of Representatives and their official force from an income tax in the District of Columbia but would impose it on all others. I then took the position in conference that if we imposed an income tax only on those domiciled within the District, then we would be imposing it only on those who of their own volition had abandoned their domiciles in the States of their origin and had elected to make their permanent home or domicile here in the District of Columbia. Such persons, it may be justly contended, have no cause to complain against an income tax that is imposed upon them only because they have

chosen to establish within the District of Columbia their permanent [2] places of abode and to abandon their domiciles within the States." 84 Cong. Rec. 8825.

In the House, Representative Nichols, chairman of the House conferees, and also chairman of the House District Committee in charge of fiscal affairs, submitted the conference report and stated: "Since the question of the effect of the word 'domicile' in this act has been raised, I think the House would probably like to have the legal definition read: 'Domicile is the place where one has his true, fixed, permanent home and principal establishment and to which, whenever he is absent, he has the intention of returning, and where he exercises his political rights.[3] . . . There must exist in combination the fact of residence and animus manendi—' which means residence and his intention to return [sic]; so that under this definition he could certainly live in the District of Columbia and have his legal domicile in any other State in the United States." 84 Cong. Rec. 8974.

Representative Bates, another of the House conferees, stated in response to a question regarding the possibility of triple taxation, "We raised that particular point [in conference] because we are much concerned about how those who come from our States would be affected by the income-tax provisions of the new law, and it was distinctly

---

[2] We do not understand "permanent" to have been used in a literal sense. Of course it cannot be known without the gift of prophecy whether a given abode is "permanent" in the strictest sense. But beyond this, it is frequently used in the authorities on domicile to describe that which is not merely "temporary," or to describe a dwelling for the time being which there is no presently existing intent to give up. And further, compare a statement by Representative Dirksen on the floor of the House, 84 Cong. Rec. 8973.

[3] Exercise of political rights elsewhere cannot be considered as meant to be conclusive on the issue of taxability in the District. See statement by Representative Dirksen on the floor of the House. *Ibid.*

452

understood that in this bill there should be no triple taxation . . ." 84 Cong. Rec. 8973.

The unusual character of the National Capital, making the income tax a "very explosive and controversial item," [4] was vividly before the Congress, and must also be considered in construing the statute imposing the tax.

The District of Columbia is an exceptional community. It is not a local municipal authority, but was established under the Constitution as the seat of the National Government. Those in Government service here are not engaged in local enterprise, although their service may be localized. Their work is that of the Nation, and their pay comes not from local sources but from the whole country. Because of its character as a Federal City, there is no local political constituency with whose activities those living in it may identify themselves as a symbol of their acceptance of a local domicile.

Not all who flock here are birds of a feather. Some enter the Civil Service, finding tenure and pay there more secure than in private enterprise. Political ties are of no consequence in obtaining or maintaining their positions. At the other extreme are those who hold appointive office at the pleasure of the appointing officer. These latter, as well as appointive officers with definite but unprotected tenure, and all elective officers, usually owe their presence here to the intimate and influential part they have played in community life in one of the States.

Relatively few persons here in any branch of the Government service can truthfully and accurately lay claim to an intention to sever themselves from the service on any exact date. Persons in all branches usually desire, quite naturally and properly, to continue family life and to have the comforts of a domestic establishment for whatever may be the term of their stay here. This is true of

---

[4] 84 Cong. Rec. 8972.

many Senators ana Congressmen, cited by Senator Overton as typical of those whom the limitation of the statute to persons "domiciled" here "necessarily excludes."

Turning to the judicial precedents for further guidance in construing "domicile" as used in the statute, we find it generally recognized that one who comes to Washington to enter the Government service and to live here for its duration does not thereby acquire a new domicile. More than a century ago, Justice Parker of New Hampshire observed that "It has generally been considered that persons appointed to public office under the authority of the United States, and taking up their residence in Washington for the purpose of executing the duties of such office, do not thereby, while engaged in the service of the government, lose their domicile in the place where they before resided, unless they intend on removing there to make Washington their permanent [5] residence." See *Atherton* v. *Thornton,* 8 N. H. 178, 180. By and large, subsequent cases have taken a like view.[6] It should also be observed

---

[5] See note 2, *supra.*

[6] *Walden* v. *Canfield,* 2 Rob. (La.) 466; *Lesh* v. *Lesh,* 13 Pa. Dist. Ct. 537; see *Woodworth* v. *St. Paul, M. & M. Ry. Co.,* 18 F. 282, 284; *Commonwealth* v. *Jones,* 12 Pa. St. 365, 371; cf. *Newman* v. *United States,* 43 App. D. C. 53, 70; reversed on another ground, 238 U. S. 537; *Deming* v. *United States,* 59 App. D. C. 188, 37 F. 2d 818; *Campbell* v. *Ramsey,* 150 Kan. 368, 388, 92 P. 2d 819; *Hannon* v. *Grizzard,* 89 N. C. 129. But cf. *Bradstreet* v. *Bradstreet,* 18 D. C. 229, 7 Mackey 229; *Sparks* v. *Sparks,* 114 Tenn. 666, 88 S. W. 173.

Professor Beale has summarized the cases as follows: "Presence for the purpose of performing the duties of a civil office will not of itself effect a change of domicil; there is no inference of *animus manendi* from the fact of the new residence, since it is explained by the fact of office holding. It makes no difference whether the office is elective or appointive; nor is it material whether the appointment is in its nature merely temporary or has a degree of permanence, though the permanence of the appointment is an element to be considered in determining the domicil." 1 Beale, Conflict of Laws § 22.6. See also, Restatement, Conflict of Laws, pp. 42–43.

that a policy against loss of domicile by sojourn in Washington is expressed in the constitutions and statutes of many States.[7]   Of course, no individual case, constitution, or statute is controlling, but the general trend of these authorities is a significant recognition that the distinctive character of Washington habitation for federal service is meaningful to those who are served as well as to those in the service.

From these various data on Congressional intent, it is apparent that the present cases are not governed by the tests usually employed in cases where the element of Federal service in the Federal City is not present.[8]   We hold that a man does not acquire a domicile in the District simply by coming here to live for an indefinite period of time while in the Government service.   A contrary decision would disregard the statements made on the floor of Congress as to the meaning of the statute, fail to give proper weight to the trend of judicial decisions, with which Congress should be taken to have been cognizant, and result in a wholesale finding of domicile on the part of Government servants quite obviously at variance with Congressional policy.   Further, Congress did not intend that one living here indefinitely while in the Government service be held domiciled here simply because he does not maintain a domestic establishment at the place he hails from.   Such a rule would result in taxing those unable to maintain two establishments, and exempting those able to meet such a burden—thus reversing the usual philosophy of income tax as one based on ability to pay.

On the other hand, we hold that persons are domiciled here who live here and have no fixed and definite intent to return and make their homes where they were formerly

---

[7] 1 Beale, Conflict of Laws, p. 172, note 2.

[8] Cf. *Williamson* v. *Osenton*, 232 U. S. 619, 624; *Gilbert* v. *David*, 235 U. S. 561.

domiciled.[9] A decision that the statute lays a tax only on those with an affirmative intent to remain here the res ᵢ of their days would be at odds with the prevailing concept of domicile, and would give the statute scope far narrower than Congress must have intended.

Cases falling clearly within such broad rules aside, the question of domicile is a difficult one of fact to be settled only by a realistic and conscientious review of the many relevant (and frequently conflicting) *indicia* of where a man's home [10] is and according to the established modes of proof.

The place where a man lives is properly taken to be his domicile until facts adduced establish the contrary. *Ennis* v. *Smith,* 14 How. 400, 423; *Anderson* v. *Watt,* 138 U. S. 694, 706. The taxing authority is warranted in treating as *prima facie* taxable any person quartered in the District on tax day whose status it deems doubtful. It is not an unreasonable burden upon the individual, who knows best whence he came, what he left behind, and his own attitudes, to require him to establish domicile elsewhere if he is to escape the tax.

To hold taxable one who contends that he is not domiciled here, the Board need not find the exact time when the "attitude and relationship of person to place" which constitute domicile, *Texas* v. *Florida,* 306 U. S. 398, 411, were

---

[9] This is not inconsistent with our holding that domicile here does not follow from mere indefiniteness of the period of one's stay. While the intention to return must be fixed, the date need not be; while the intention to return must be unconditional, the time may be, and in most cases of necessity is, contingent. The intention must not waver before the uncertainties of time, but one may not be visited with unwelcome domicile for lacking the gift of prophecy.

[10] Of course, this term does not have the magic qualities of a divining rod in locating domicile. In fact, the search for the domicile of any person capable of acquiring a domicile of choice is but a search for his "home." See Beale, Social Justice and Business Costs, 49 Harv. L. Rev. 593, 596; 1 Beale, Conflict of Laws, § 19.1.

formed, so long as it finds they were formed before the tax day. What was at first a firm intent to return may have withered gradually in consequence of dissolving associations elsewhere and growing interests in the District. It is common experience that this process usually is unmarked by any dramatic or even sharply defined episode. The taxing authority need not find just when the intent was finally dissipated; it is enough that it finds that this has happened before the tax day.

If one has at any time become domiciled here, it is his burden to establish any change of status upon which he relies to escape the tax. *Anderson* v. *Watt, supra,* at p. 706.

In order to retain his former domicile, one who comes to the District to enter Government service must always have a fixed and definite intent to return and take up his home there when separated from the service. A mere sentimental attachment will not hold the old domicile. And residence in the District with a nearly equal readiness to go back where one came from, or to any other community offering advantages upon the termination of service, is not enough.

One's testimony with regard to his intention is, of course, to be given full and fair consideration, but is subject to the infirmity of any self-serving declaration, and may frequently lack persuasiveness or even be contradicted or negatived by other declarations and inconsistent acts.

Whether or not one votes where he claims domicile is highly relevant but by no means controlling.[11] Each State prescribes for itself the qualifications of its voters, and each has its own machinery for determining compliance with such qualifications. A vote cast without challenge and adjudication may indicate only laxity of the

---

[11] See statements of Representative Dirksen, 84 Cong. Rec. 8973.

state officials, and even an adjudication of the right to vote cannot preclude the levy of a tax by an arm of the Federal Government. On the other hand, failure to vote elsewhere is, of course, not conclusive that domicile is here.

Also of great significance is the nature of the position which brings one to or keeps him in the service of the Government: whether continuous or emergency, special or war-time in character; whether requiring fixed residence in the District or only intermittent stays; whether entailing monetary sacrifices or betterment; and whether political or non-political. Those dependent upon the action of a local constituency on the first Tuesday after the first Monday in November are, of course, loath to leave their local identifications behind when taking up Government duties in Washington.

Of course, the manner of living here, taken in connection with one's station in life, is relevant. Did he hire a furnished room or establish himself by the purchase of a house? Or did he rent a house or apartment? Has he brought his family and dependents here? Has he brought his goods? What relations has he to churches, clubs, lodges, and investments that identify him with the District?

All facts which go to show the relations retained to one's former place of abode are relevant in determining domicile. What bridges have been kept and what have been burned? Does he retain a place of abode there, or is there a family home with which he retains identity? Does he have investments in local property or enterprise which attach him to the community? What are his affiliations with the professional, religious, and fraternal life of the community, and what other associations does he cling to? How permanent was his domicile in the community from which he came? Had it long been a family seat, or was he there a bird of passage? Would a return to

the old community pick up threads of close association? Or has he so severed his relations that his old community is as strange as another? Did he pay taxes in the old community because of his retention of domicile which he could have avoided by giving it up? Were they nominal or substantial? In view of the legislative history showing that Congress was concerned lest there be "triple taxation"—Federal, State and District—the Board should consider whether taxes similar in character to those laid by this Act have been paid elsewhere. See statement of Representative Bates, quoted *supra,* p. 451.

Our mention of these considerations as being relevant must not be taken as an indication of the relative weights to be attached to them, as an implied negation of the relevance of others, or as an effort to suggest a formula to handle all cases that may arise, or the possibility of devising one.

In view of what we have said, it is clear that the present cases did not call for rulings of non-taxability "as a matter of law." On the other hand, we do not consider whether taxability follows as a matter of law, as petitioner contends it does, for the factual inquiries and findings of the Board, made under a view of the law not our own, are quite likely not in all respects those which the Board would have made had it proceeded with knowledge of our opinion, and are in some respects ambiguous for the purpose of decision in accordance with it. Accordingly, we reverse the decisions by the United States Court of Appeals for the District of Columbia and remand these cases to that Court with directions to remand to the Board for further proceedings in conformity with this opinion.

*Reversed.*

The CHIEF JUSTICE, MR. JUSTICE ROBERTS, and MR. JUSTICE REED took no part in the consideration or decision of these cases.