LINCOLN T. TAIRA, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5240–64. Filed January 29, 1969.

*C. R. E. Smith*, for the petitioner.

*Harry Morton Asch* and *Nicholas G. Stucky*, for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in petitioner's Federal income taxes for the calendar years 1960, 1961, and 1962 as follows:

| | |
|---|---|
| 1960 | $631. 00 |
| 1961 | 678. 37 |
| 1962 | 697. 86 |

The only issue for determination is whether petitioner's salary during the years in issue represented community income of himself and his alien wife by virtue of his being a California domiciliary.

### FINDINGS OF FACT

Some of the facts are stipulated and are so found.

Petitioner Lincoln T. Taira (hereinafter sometimes referred to as petitioner or Lincoln), at the time the petition in the instant case was filed resided at 192 Yogi Mawashi, Naha City, Okinawa, Ryukyu Islands. His Federal income tax returns for the calendar years 1960, 1961, and 1962 were filed with the director of international operations at Washington, D.C.

Lincoln is a native-born American citizen. His parents, who have always remained Japanese citizens, emigrated to the United States from Okinawa around 1900, and Lincoln was born in Raton, N. Mex., in 1914. His family resided in Raton until 1922 when they moved from Raton to Brawley, Calif. From that time until August 1938, Lincoln resided in Brawley. He attended school there and eventually received a

bachelor of science degree in business administration and economics from St. Mary's College, Moraga, Calif.

In August 1938, Lincoln left the United States and moved to Japan for purposes of study and travel. While in Japan he learned to read and write Japanese and was able to complete 1 year of law school before he returned to Brawley in 1940 because of the imminence of hostilities between the United States and Japan.

From December 1940 to September 1941, Lincoln was employed as a sales clerk in Brawley. In October 1941, he was inducted into the U.S. Army and was assigned to various posts of duty in the United States and the Asiatic-Pacific theater of war. While he was overseas he was an interpreter in the Philippines, which position he held until December 1945, when he was discharged.

Following his discharge, Lincoln returned to California where he was employed by a hotel in Los Angeles. At that time his parents and brother lived in Los Angeles and he resided with them. In August 1947, Lincoln signed a 12-month contract as an interpreter with Atkinson & Jones Construction Co. in connection with a construction contract between Atkinson and the U.S. Army Engineer District, Okinawa, Corps of Engineers. The place of employment was Okinawa, and under the terms of the agreement the employer was to pay Lincoln's travel expenses to Okinawa and his expenses back to Los Angeles upon completion of the contract.

Lincoln was employed by Atkinson on Okinawa until 1950. When his employment was completed, Lincoln did not elect to return to the United States. Instead he obtained employment on Okinawa as an indigenous training instructor with the Department of Air Force from July 1950 through May 3, 1952. With the exception of occasional temporary assignments to the U.S. Air Force Base, Tachikawa, Japan, he worked in Okinawa during this period.

When his employment with the Air Force terminated, Lincoln did not return to the United States, but instead applied for and obtained a position as a civilian employee with the Department of the Army, Headquarters, Ryukyu's Command, as a realty specialist, which position he still held at the time of trial. His specific duties, all performed on Okinawa, involve the negotiation of real estate contracts. Lincoln's bilingual abilities specially qualify him to explain American real estate policies to the Okinawans.

Since arriving in Okinawa, Lincoln has established strong domestic ties with the island. His wife, Yukiko, whom he married in 1948, was born, raised, and has always resided in Okinawa. She is a Japanese citizen and has never applied for U.S. citizenship. Lincoln and Yukiko have four children, all born on Okinawa, the eldest of whom, Hugh, was born in 1949.

Until 1950, Lincoln and Yukiko lived in quarters furnished by Atkinson & Jones Construction Co. At that time they moved to Naha City in Okinawa in a home owned by Yukiko's brother, Shoko Higa. At the present time they are living in a home which Shoko Higa built on land which he purchased in 1954. Title to the home was taken and is held in Yukiko's name because petitioner understood that U.S. citizens were severely restricted in permissible ownership of real property. In conformance with U.S. Government practice, Lincoln has received a living-quarters allowance in lieu of having Government-owned quarters provided for himself and his family.

Yukiko's parents and brother all live in Okinawa. She sees them and other relatives about twice a month and also attends family celebrations which are held twice a year. In addition to family activities Yukiko also belongs to an organization composed of girls with whom she went to school.

Lincoln's mother and father, who never gave up their Japanese citizenship, moved back to Okinawa in 1953, shortly after Lincoln started working in his present position. His father, who was 94 at the time of trial, owns property in Okinawa and still resides on the island. His mother died on Okinawa in 1958.

In raising his family, Lincoln has attempted to bring his children up in an American environment. Though Japanese is spoken in the household due to Yukiko's limited knowledge of English, the children cannot read or write in Japanese. All of the children speak, read, and write English, and have all attended schools in Okinawa operated for dependents of American personnel. Hugh, the eldest, was attending Whittier College in Whittier, Calif., at the time of trial. The family attends church at the Air Base Chapel at Naha Air Base.

Lincoln maintains close association with Americans and belongs to the following organizations in Okinawa: The American Legion, Veterans of Foreign Wars, Free and Accepted Masons, Scottish Rite, Shrine Club, and the American Federation of Government Employees.

Since 1947, Lincoln has not attempted to find work in the United States. He has never held legal title to any real property in the United States and has no business interests in this country. His banking accounts are all with banks or branches thereof located on Okinawa. He has some relatives living in the United States, including three brothers and two sisters living in Los Angeles, Calif., and a number of friends scattered throughout the country with whom he corresponds. In addition, as mentioned above, his son started to attend Whittier College in Whittier, Calif., in the fall of 1967.

Lincoln has not filed a California income tax return since he started residing in Okinawa in 1947. Since residing in Okinawa, he has voted in only three elections, all by absentee ballots cast in Los Angeles,

Calif., the first of which was on July 29, 1964. His reason for voting in the 1964 election was partially because the Internal Revenue Service was "on my [his] heels." He has never voted in Okinawa.

Since 1947 he has returned to the United States only three times. In 1951 he returned for 51 days to visit his seriously ill mother; in 1965 he and his wife and children came to obtain medical treatment for his wife; and in 1967 he returned for 47 days to enroll his son in college.

Petitioner filed individual, "Head of Household," Federal income tax returns for the years 1960, 1961, and 1962. On such returns he showed total income of $7,200, $7,425.60, and $7,518.40, respectively, and then excluded one-half of these amounts from his taxable income on the basis that his earnings were community property. On these returns he used a U.S. mailing address—APO 331, San Francisco, Calif.

For the calendar years 1960, 1961, and 1962, Yukiko filed U.S. Nonresident Alien Income Tax Returns on which she included the other one-half of Lincoln's total wages, and requested a refund of one-half of the Federal income taxes withheld from such wages. These refunds were made, and she received, including interest, $409.50, $433.15, and $443.87, respectively.

In his statutory notices of deficiency, respondent determined that Lincoln was not allowed to exclude any portion of his salary, because he had not established that he was domiciled in a community property State during any of the years in issue.

### ULTIMATE FINDING OF FACT

During the years in issue Lincoln Taira was domiciled in Okinawa, Ryukyu Islands, and was not a California domiciliary.

### OPINION

Petitioner Lincoln T. Taira is an American citizen who has been a bona fide resident of Okinawa, Ryukyu Islands, since 1947. During the years in issue he received wages from the Department of the Army, Headquarters, Ryukyu's Command, a branch of the U.S. Government. The above facts are undisputed, and the parties agree that under section 911(a) of the Internal Revenue Code [1] such amounts, *to the extent*

---

[1] All references are to the Internal Revenue Code of 1954 unless otherwise indicated.

SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES.

(a) GENERAL RULE.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:

(1) BONA FIDE RESIDENT OF FOREIGN COUNTRY.—In the case of an individual citizen of the United States who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources

*they are his income*, represent taxable income to him because they were received from the United States or one of its agencies.

It is petitioner's contention that during the years in issue he was a domiciliary of California, subject to the community property laws of that State, which give each spouse the right to one-half of community income. He contends therefore, that only one-half of his wages represent his income and consequently that he is subject to Federal income tax on the receipt of only that amount.

Respondent does not dispute petitioner's legal premise, but contends, "simply that petitioner, during the years [in issue], * * * was domiciled in Okinawa, Ryukyu Islands, and not in California as petitioner contends." Thus a question of pure fact is presented for our decision.

Respondent admits, and we now find, that petitioner was domiciled in California in 1947 when he left that State to work for the Atkinson & Jones Construction Co. in Okinawa, under a 12-month contract to do work for the Federal Government. We also, find that due to the temporary nature of the work, petitioner intended to return to California upon completion of the contract. The question remains whether during the subsequent years prior to 1960, while continuing to do work for or on behalf of the Federal Government, petitioner gave up California and adopted Okinawa as his domicile.

In determining whether a person has given up an established domicile, we recognize that the relevant criteria are somewhat different from the general criteria when that person is in Government service and has moved into an area which is not within the boundaries of any State. This is petitioner's situation, and the distinctions between this situation and that of the more usual move from one State to another to find employment has previously been discussed by the Supreme Court in *Dist. of Columbia* v. *Murphy*, 314 U.S. 441 (1941). Such discussion is relevant to the instant case.

The Supreme Court in *Murphy* was faced with the problem of how to determine whether a Federal employee, who lived outside any State, had given up his former domicile. Though that case involved the interpretation of a D.C. statute which levied an income tax only on D.C. domiciliaries, the Court's discussion of the question was not confined to congressional intent, and specifically used judicial precedent involving general determination of domicile as a guide.

without the United States (*except amounts paid by the United States or any agency thereof*) which constitute earned income attributable to services performed during such uninterrupted period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c). [Emphasis supplied.]

The above provision is as enacted for the year 1962 and thereafter, changing the provision as originally enacted in 1954, but which changes, however, are not material to the decision in the instant case.

In making its determination the Court pointed out that an individual does not lose his domicile merely because he accepts employment in connection with Government work, as the motives for entering Government service are too diverse. If the employee has a fixed intent to return to the State which constituted his domicile before he left for Government service, and the intent to return to that State is unconditional, he does not obtain a new domicile no matter how long he stays with the Government. As the Court stated (314 U.S. at 455 fn. 9):

While the intention to return must be fixed, the date need not be; while the intention to return must be unconditional, the time may be, and in most cases of necessity is, contingent. The intention must not waver before the uncertainties of time, but one may not be visited with unwelcome domicile for lacking the gift of prophecy.

Further, where the Government employment takes an individual to a Federal city (or in the instant case, a federally controlled island), the Supreme Court pointed out that failure to maintain a physical residence in the former State while performing Government service is not necessarily significant as a factor in determining if a taxpayer has abandoned his old domicile.

On the other hand, the Court pointed out that an individual who comes to a Federal enclave can acquire a new domicile if his unconditional intent to return to his former domicile (314 U.S. at 456)—

withered gradually in consequence of dissolving associations elsewhere and growing interests in the * * * [new location]. It is common experience that this process usually is unmarked by any dramatic or even sharply defined episode. The taxing authority need not find just when the intent was finally dissipated; it is enough that it finds that this has happened before the * * * [taxable year].

The Court then set out the following factors to be considered in determining a taxpayer's domicile, stating (pp. 456–458):

One's testimony with regard to his intention is, of course, to be given full and fair consideration, but is subject to the infirmity of any self-serving declaration, and may frequently lack persuasiveness or even be contradicted or negatived by other declarations and inconsistent acts.

Whether or not one votes where he claims domicile is highly relevant but by no means controlling.[11] * * * and even an adjudication of the right to vote cannot preclude the levy of a tax by an arm of the Federal Government. * * *

Also of great significance is the nature of the position which brings one to or keeps him in the service of the Government: whether continuous or emergency, special or war-time in character; whether requiring fixed residence in the District or only intermittent stays; whether entailing monetary sacrifices or betterment; and whether political or non-political. * * *

Of course, the manner of living here, taken in connection with one's station in life, is relevant. Did he hire a furnished room or establish himself by the purchase of a house? Or did he rent a house or apartment? Has he brought his family and dependents here? Has he brought his goods? What relations has he to churches, clubs, lodges, and investments that identify him with the District?

All facts which go to show the relations retained to one's former place of abode

are relevant in determining domicile. What bridges have been kept and what have been burned? Does he retain a place of abode there, or is there a family home with which he retains identity? Does he have investments in local property or enterprise which attach him to the community? What are his affiliations with the professional, religious, and fraternal life of the community, and what other associations does he cling to? How permanent was his domicile in the community from which he came? Had it long been a family seat, or was he there a bird of passage? Would a return to the old community pick up threads of close association? Or has he so severed his relations that his old community is as strange as another? Did he pay taxes in the old community because of his retention of domicile which he could have avoided by giving it up? Were they nominal or substantial? * * * [Footnote omitted.]

In applying the above criteria to the instant case, we note that petitioner testified that at all times he intended to return to Los Angeles, Calif., when the Government no longer had need for his services. However, his reasons for doing so are not given and are certainly not obvious.

During all relevant periods petitioner did not have any economic interests to protect in California and did not pay taxes there. Though he had some relatives in California, his closest were his mother and father, who also came to live in Okinawa. There was no reason for petitioner to go to California for his wife's benefit, as she was a native of Okinawa whose close relatives were near her. Also, her inability to speak English would have made the transition away from Okinawa difficult. Insofar as his job opportunities were concerned, Lincoln admitted that his bilingual abilities suited him to work in Okinawa as much if not more than any other place. None of his prior jobs in California were of a nature which would promote any desire to return to that State. Further, from 1952 to the date of trial, petitioner has held a permanent position as a realty specialist, and no longer works on a short-term agreement as he did when he first arrived in Okinawa and worked with Atkinson & Jones Construction Co. and the Department of the Air Force. There is no evidence that his position is dependent upon political favor which would require close ties with California.

Lincoln's entire manner of living is more in line with the gradual establishment of a permanent domicile than the maintenance of a temporary residence. Prior to the years in issue, he progressed from living in company-supplied housing furnished by Atkinson & Jones Construction Co., to living in a relative's house, to finally owning his own home, through the device of placing title in his wife's name. This gradual progression is consistent with a withering intent to return to California.

Lincoln has established social contacts in the area and is a member of a number of organizations on the island. There is no evidence that he is a member of any organization which is located in California. He

has voted in California three times since 1964, but this fact is of minimal value, since he admitted that he voted in 1964 in part because the Internal Revenue Service was "on * * * [his] heels." Prior to voting in the 1964 elections, he had not previously voted since 1947.

The evidence does establish that petitioner has raised his children as English-speaking American citizens and educated them in American schools. His son currently attends Whittier College in Whittier, Calif. Such evidence establishes that petitioner intended that he and his children should remain American citizens in practice as well as by birthright. It fails to establish that petitioner does not intend to remain on Okinawa indefinitely.

We find and hold from the entire record that during the years in issue petitioner did not have a fixed intent to unconditionally return to California. In fact, on inquiry by respondent, petitioner admitted that if a suitable job in Japan were available, which job offered him economic advantages, he would accept such a job rather than return to the United States.

At best, during the years in issue, petitioner had a sentimental attachment to California, but this is not sufficient. As the Supreme Court stated in *Dist. of Columbia* v. *Murphy, supra* at 456:

A mere sentimental attachment will not hold the old domicile. And residence in the District with a nearly equal readiness to go back where one came from, or to any other community offering advantages upon the termination of service, is not enough.

In the instant case there is no evidence that anything other than petitioner's own preference has prevented his return to California. He has voluntarily remained on Okinawa for approximately 21 years and we find and hold that he has established a domicile there. During the years in issue, petitioner was not domiciled in California, not subject to California community property laws, and consequently could not exclude any part of his earnings on the basis that they represented community income.

*Decision will be entered for the respondent.*