IONA SUTTON LANE-BURSLEM, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 934–75. Filed August 3, 1978.

*Robert E. Falb,* for the petitioner.
*Paul E. Vignone,* for the respondent.

IRWIN, *Judge:* Respondent determined deficiencies in petitioner's income taxes for the calendar year 1971 in the amount of $1,296.22.

Due to other concessions, the only issue remaining for our consideration is whether petitioner is domiciled in Louisiana and, therefore, subject to the income tax treatment of a domiciliary of a community property State.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

At the time her petition was filed Iona Sutton Lane-Burslem (hereafter petitioner) resided in Upper Heyford, England.

Petitioner filed her Federal income tax return using the married, filing separate, status, for the calendar year 1971 with

the Internal Revenue Service Center at Austin, Tex. The address indicated on the return was Natchitoches, La.

Petitioner is a native-born citizen of the United States and until 1951 was at all times domiciled in Louisiana. She is certified to teach in the public schools of Louisiana, and as a result, is qualified to teach in schools operated overseas by the United States Government for American dependents. Except for 1 year (1949–50) in which she lived in San Francisco, Calif., petitioner resided continuously in Louisiana from the time she was born (1922) until 1951, at which time she became employed overseas by the United States Government as a secondary school teacher.

Except for the school year 1955–56, petitioner has been stationed in Europe. Since 1972, petitioner has been stationed at the Upper Heyford American High School, a United States Air Force dependents' school, situated at the Upper Heyford Air Base, a North American Treaty Organization (hereafter NATO) facility in England. Prior to 1972 she taught at American dependents' schools in High Wycombe, England (1971 to 1972, inclusive); Watford, England (1962 to 1970, inclusive); London, England (1961 to 1962, inclusive); Morocco (1959–60); London, England (1957 to 1959, inclusive); Frankfurt, Germany (1956 to 1957, inclusive); Stuttgart, Germany (1954–55); Frankfurt, Germany (1952–54, inclusive); and Heidelberg, Germany (1951–52). Initially, changes in petitioner's duty stations were made at her request to satisfy her desire to live and work in different cities. The more recent transfers, however, resulted from actual or anticipated closings of NATO air bases and reductions in military and civilian forces in England.

Petitioner is employed on a year-to-year basis for a minimum term of 1 school year, consisting of 190 days. She is entitled to receive, at Government expense, transportation for herself and her family and movement and storage of her household goods and personal effects if she agrees to complete a 2-year tour of duty. She is also entitled to retire at age 60; retirement benefits are measured by average compensation during the 3 years in which she receives the highest pay. She will receive maximum benefits only if she remains with the Department of Defense until retirement. To petitioner's knowledge, she would be unable to obtain comparable employment as a teacher with the

Department of Defense anywhere in the United States (although she could teach school in Louisiana).

As an employee of a civilian component of the United States Armed Forces, under the NATO Status of Forces Agreement, petitioner is not a resident or domiciliary of the United Kingdom for purposes of taxation.

In 1964, petitioner married Eric Lane-Burslem (hereafter Eric), a British national who resides and is domiciled in England and a nonresident alien with respect to the United States. Eric was employed as an executive engineer until 1969. His immediate family consists of two brothers, two sisters, a daughter by a prior marriage, and four grandchildren. Eric's daughter and his four grandchildren reside in Germany. He visits them about once a year and would maintain this relationship if he moved to Louisiana. Eric has lived in numerous countries during his career as a professional airline pilot, and does not have any particularly strong attachments to England.

The Lane-Burslems live in a home in Oxfordshire, England. The property is owned solely by petitioner, having been purchased with funds provided by the United States Government as a housing allowance in lieu of furnishing Government-owned living quarters. Prior to 1972, petitioner owned a house in Northwood, where she and Eric lived while she taught at High Wycombe; before that she owned a house in Harrow, where they lived while she taught at Watford. Prior to the purchase of the house in Harrow in 1963, petitioner lived in accommodations furnished by the Government at her various posts of employment, or rented other houses (except for 1955–56 when she was not in Europe). The Northwood and Harrow houses were sold as a consequence of the changes in petitioner's posts of employment. If petitioner sells her real property when she retires, she would repatriate the proceeds of sale. Petitioner has been specifically authorized by the Bank of England to repatriate such proceeds free of British currency controls.

Prior to 1966, the question of the couple's residence after their retirement had not been considered or discussed. When petitioner's mother visited the Lane-Burslems in England in 1966, she told Eric that she expected him, as a member of the Sutton family, to be interred in the family cemetery plot in Natchitoches. Eric readily agreed to this.

Petitioner intends to remain in England until approximately

1981 or 1982, at which time she intends to retire. At that time, Eric, who is 16 years older than petitioner, will be 76. The Lane-Burslems will not suffer any economic loss if they return permanently to Louisiana after petitioner's retirement. Eric retired as an executive engineer in 1969, but obtained part-time employment as a sales manager until 1972, at which time he was earning about $5,000 annually. He gave up all employment in 1972 as a result of petitioner's transfer from the High Wycombe school to Upper Heyford. Eric's pension will be paid to him notwithstanding permanent residence in the United States. Neither Eric nor petitioner owns any business or investment assets in the United Kingdom. Other than an annual fox hunt, the Lane-Burslems belong to no clubs or social organizations in the United Kingdom, other than those connected with petitioner's employment. In accordance with the Status of Forces Agreement, petitioner abstains from all political activity in the United Kingdom. Petitioner does maintain a sterling account with a bank in England, such account being necessary to purchase items from English merchants.

Central Louisiana has been the seat of petitioner's family for several generations. Her family there, at the time of trial, consisted of her mother, Mrs. J. W. C. Sutton; her sister, Mrs. M. S. Matthews, both of whom resided in Natchitoches; and three brothers, two of whom lived in Alexandria, La., and a third in Lafayette, La. Petitioner also had six nieces and nephews and five grandnieces in Louisiana.

Petitioner was educated in Louisiana. She received her high school diploma from Belcher High School, Belcher, La., in 1939, and her bachelor of arts degree from Northwestern State University in Natchitoches in 1942. Petitioner also earned a master of arts in education from Louisiana State University, Baton Rouge, La, in 1951, and obtained 30 credits beyond her M.Ed. by attending courses at Northwestern State University during the summers of 1972 to 1974, inclusive.

Petitioner normally returns to Natchitoches each summer after her teaching assignment in England is completed in mid-June of each school year. She remains in Louisiana for approximately 60 days, returning to England in the last week of August to resume her teaching duties. The Government pays the air fare for petitioner's and Eric's home leave biennially. In the summers of 1972, 1973, and 1974, petitioner used Government-

paid education leave to attend courses in Natchitoches. After Eric gave up his employment in 1972, he joined petitioner on her trips to Louisiana. During the summer of 1975, however, she stayed in Europe, where she was visited by her sister and mother.

While in Natchitoches, the Lane-Burslems live at the Sutton family home owned by petitioner's mother. Petitioner and Eric have their own room in the house. That room permanently contains their summer clothing and some personal effects. The majority of petitioner's furniture, however, is kept in England. The room is not a guestroom and is not used by others in petitioner's absence. Petitioner, who with her sister will inherit the house at her mother's death, intends to purchase her sister's interest if she resides there permanently after her retirement. Petitioner receives mail at the house while she is in England, and her mother then forwards it to her.

Petitioner is registered to vote in Natchitoches. Since 1951, she has consistently voted in Federal, State, and local elections in person when she is present in Natchitoches on primary or election days, and by absentee ballot when she is not. She owned residential real property situated in Natchitoches from 1956 to 1965. The property was purchased as an investment and managed by petitioner's father until his death in 1964 after which she was compelled to sell it because neither she nor her mother could manage it.

Throughout her adult life, petitioner has maintained a checking account at the City Bank & Trust Co. in Natchitoches. She regularly deposits a portion of her salary in the account and draws checks to pay for goods purchased on United States military facilities in England (since such goods must be paid for in American currency). She also maintains savings accounts at the Guaranty Bank & Trust Co. in Morgan City, La., and the First Federal Savings & Loan Association of Natchitoches. Petitioner has several charge accounts in Natchitoches retail stores, all of which depend upon the merchants' personal recognition of her.

Petitioner uses the services of doctors, attorneys, accountants, and other professionals in the Natchitoches area, with whom she is acquainted through family connections or friendships. However, petitioner's affiliations with Louisiana civic and social associations are on an inactive basis, and petitioner does not pay

taxes in Louisiana due to an exemption of her income earned from sources outside of Louisiana.

## OPINION

Petitioner contends that during 1971 she was domiciled in Louisiana, thereby subject to its community property laws which give each spouse the right to one-half of community income. If so, both respondent and petitioner agree that only one-half of her wages would represent her income and be subject to Federal income taxation.[1]

Respondent contends that petitioner was (and continues to be) domiciled in England since at least 1971. Both parties agree that Louisiana law is determinative of petitioner's domiciliary status. It is respondent's position that Louisiana law creates the presumption that a wife takes her husband's domicile, which presumption can be rebutted only where there has been an indication of ill treatment or misconduct and the wife is no longer willing to live with her husband and in fact separates from him.[2]

---

[1] This is because one-half of petitioner's earned income would be treated as being Eric's income, and thus the income of a nonresident alien spouse which is not subject to U.S. taxation in this instance since it is from foreign sources. Rev. Rul. 56–268, 1956–1 C.B. 317–318.

Sec. 879, I.R.C. 1954, added by the Tax Reform Act of 1976, Pub.L. 94–455, sec. 1012(b)(1), effective only for taxable years beginning after Dec. 31, 1976, was enacted specifically to deal with the problems this case presents. This section, dealing with community income of residents or citizens of the United States married to nonresident aliens, provides, in pertinent part, that:

(a) GENERAL RULE.—In the case of a citizen or resident of the United States who is married to a nonresident alien individual and who has community income for the taxable year, such community income shall be treated as follows:

(1) Earned income (within the meaning of section 911(b)), other than trade or business income and a partner's distributive share of partnership income, shall be treated as the income of the spouse who rendered the personal services, * * *

Thus, under this new section, petitioner's income would be taxed as though it were her income only, regardless of the effects of community property laws. This result may technically be avoided if the taxpayer makes an election under sec. 6013(g) or (h) to treat the nonresident alien as a resident of the United States. However, this election (which provides the couple with the benefits of filing a joint return, otherwise unavailable) would still result in such income being taxed in full.

[2] Under Louisiana law, a change of domicile requires both actual residence in the new location and an intention to remain there. *Texas v. Florida*, 306 U.S. 398 (1939); *Burke v. Massachusetts Bonding & Ins. Co.*, 209 La. 495, 19 So.2d 647 (La. Ct. App. 1944), affd. 24 So.2d 875 (La. 1946). As we noted in *Taira v. Commissioner*, 51 T.C. 662, 666 (1969), in determining whether a person has given up an established domicile the relevant criteria are somewhat different when that person is in Government service and has moved into an area which is not within the boundaries of any State. We then applied the criteria set forth by the Supreme Court in *Dist. of Columbia v. Murphy*, 314 U.S. 441 (1941), to determine whether the employee retained his original domicile, for if the employee has a fixed intent to return to the State which constituted his domicile before he left for Government service, and the intent to return to that State is unconditional, he does not obtain a new domicile no matter how long he stays with the Government. Both respondent and petitioner argue that application of these criteria

Petitioner argues that this is not a proper statement of Louisiana law, or in the alternative, that if this is a proper statement of Louisiana law, the statute violates both the Equal Protection Clause of the Fourteenth Amendment and the Due Process Clause of the Fifth Amendment. Petitioner further contends that respondent, as a matter of policy without regard to State law improperly determines a married woman's domicile by reference to that of her husband and, therefore, the notice of deficiency is void. Despite petitioner's excellent and persuasive brief, we do not believe she has met her burden of proof to show that Louisiana community property law would operate in such a manner as to allocate half of her income to Eric.

Louisiana Civil Code Annotated article 39 (West 1952) provides that "A married woman has no other domicile than that of her husband." Louisiana Revised Statute section 9:101 (1950) provides that "All married women * * * are fully emancipated from all the disabilities and relieved from all the incapacities to which, as such, they were formerly subject." Petitioner contends that this statute permits a woman to establish a separate domicile apart from that of her husband.

We believe, however, that even if Louisiana were to hold that a wife and husband could have separate domiciles while living together (which we doubt),[3] one domiciled within Louisiana and

---

support their positions. Applying these criteria we believe that petitioner has shown that she has a fixed intent to return to Louisiana. However, as discussed hereinafter, the issue here is whether petitioner may have a legally significant domicile separate from that of her husband. Unless this were the case, intent would not be dispositive. Rather, the circumstances of the other spouse must be taken into account.

[3]After Louisiana's statute emancipating married women, La. Rev. Stat. sec. 9:101 (1950), was enacted, the Louisiana courts continued to apply art. 39 as before, e.g., *Morrison v. Morrison*, 316 So.2d 453 (La. Ct. App. 1975); *Bush v. Bush*, 232 La. 747, 95 So.2d 298 (1957). Cf. *Commonwealth v. Rutherfoord*, 160 Va. 524, 169 S.E. 909 (1933). In that case the court allowed a wife living amicably with her husband to maintain a separate domicile, resting on the Virginia married women's statute emancipating women, where the wife and husband agreed prior to their marriage that she would retain her own domicile.

In *Welsh v. Welsh*, 322 So.2d 352 (La. Ct. App. 1975), a husband argued that a parish court lacked jurisdiction to grant his wife a legal separation because the wife could not establish a separate domicile. The court stated that art. 39 was simply an "aphorism," a legal maxim that if a husband and wife are living together, the two spouses have only that one domicile, and that any other interpretation would violate the Louisiana Constitution. The court there, by implication, was only extending the previous exceptions to common domiciliary by permitting separate domiciles whenever a wife lived apart regardless of cause. However, on appeal, the Louisiana Supreme Court refused to consider the constitutional objections since it reached the same result as the lower court on the traditional notion that the wife may acquire a separate domicile from her husband if she is abandoned or if her husband's misconduct justifies her leaving, *Johnson v. Welsh*, 334 So.2d 395 (La. 1976). That a married couple has one domicile is based upon Louisiana's strong public policy consideration that the social and economic doctrine of marital unity demands that the concept of a family unit be protected

one without, it would not regard the wife's separate earnings from sources outside Louisiana as community property belonging one-half to her husband. There are many cases in which it has been held that the wife need not reside with her husband and yet the husband's earnings were deemed subject to the community property laws of the State in which he was domiciled. However, in each of these cases the wife's domicile was by operation of law deemed to be that of her husband. See, e.g., *Gooding v. Commissioner*, 27 T.C. 627 (1956), affd. 250 F.2d 765 (D.C. Cir. 1957); *Owens v. Commissioner*, 26 T.C. 77 (1956); *Hunt v. Commissioner*, 22 T.C. 228 (1954); *Cavanagh v. Commissioner*, 42 B.T.A. 1037 (1940), affd. 125 F.2d 366 (9th Cir. 1942); *Marshall v. Commissioner*, 41 B.T.A. 1064 (1940); *Succession of McKenna*, 23 La. Ann. 369 (1871). Thus, both husband and wife maintained the same domicile, i.e., the domicile of the marital community remained at all times within the community property State.

In *Payne v. Commissioner*, 1 T.C. 360 (1942), affd. 141 F.2d 398 (5th Cir. 1944), we assumed arguendo that the petitioner therein (the wife) was domiciled in Texas, a community property State, and her husband was domiciled in Ohio, a common law property State. Relying on Texas law that the "marital rights" of persons married elsewhere shall upon their removal to Texas be regulated by the laws of Texas, we held that only upon becoming domiciled in Texas would a husband secure community property rights; thus, in the absence of a previous matrimonial domicile in Texas, a husband who remains domiciled outside the State secures no community rights in the income of a wife merely because she alone acquires a Texas domicile. Louisiana Civil Code Annotated article 2401 (West 1952) provides that "a marriage, contracted out of this State, between persons who afterwards come here to live, is also subjected to community of acquets with respect to such property as is acquired after their arrival." On this basis, we believe that Louisiana law comports

---

and made secure by permitting one family to have only one domicile. *DuVernay v. Ledbetter*, 61 So.2d 573 (La. Ct. App. 1952).

Moreover, we do not feel that there are any special circumstances here that would lead us to believe that petitioner's domicile is different from Eric's. See 1 Restatement 2d, Conflict of Laws, sec. 21 (1969); *Martin v. Hefley*, 259 Ark. 484, 533 S.W.2d 521 (1976); *Ashmore v. Ashmore*, 251 So.2d 15 (Fla. Ct. App. 1971).

with Texas law. Therefore, it would be necessary for both the husband and wife to have their domiciles in Louisiana in order to create a marital community in which both spouses would share in the earnings of the Louisiana domiciliary.[4] See also *Gooding v. Commissioner, supra.*

Petitioner in the alternative contends that if both spouses must maintain the same domicile, that the law of the place in which the couple intended to be domiciled was Louisiana so that even though Eric's domicile would otherwise be England, the matrimonial or intended domicile was Louisiana.[5] There is some support for petitioner's argument that if Louisiana Civil Code Annotated article 39 (West 1952), requires both spouses to maintain the same domicile, it is not necessarily the husband's in light of the State Constitution of 1974 provision that provides that "No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because * * * of * * * sex," La. Const. art. 1, sec. 3 (which, however, does not have retroactive effect, art. 14, sec. 26; and see *Perez v. Perez*, 334 So.2d 719 (La. Ct. App. 1976); *State v. Coleman*, 322 So.2d 195 (La. 1975)).

Without deciding whether Louisiana courts would adopt this concept to the extent suggested by petitioner, we believe that on the facts presented here, the matrimonial domicile would be England. Eric had no fixed intention of moving to Louisiana at the time of the marriage, albeit neither petitioner nor Eric consciously selected a matrimonial domicile at that time. It was not until 1966, at the earliest, that Eric and petitioner formed a joint intent to return to Louisiana. Moreover, even then, they did not plan to go there until petitioner retired, approximately 15 years later and Eric's first trip to Louisiana was in 1972. Although petitioner consistently returned home every year, 10

---

[4]Moreover, under Louisiana Civil Code Annotated article 2334 (West 1962), the earnings of the wife when living separate and apart from her husband are deemed her separate property and not part of the community. Clearly, Louisiana law does not have any effect over Eric's earnings and would not give petitioner one-half of his earnings. This lends support to our conclusion and that Louisiana would not interpret its laws in such a manner as to provide Eric with a share of petitioner's earnings (although Louisiana law would not deem the earnings of the Louisiana-domiciled husband his separate property if the wife were living separate and apart from him).

[5]Petitioner argues that a male in her circumstances would have retained his Louisiana domicile (since there was a fixed intention to return to Louisiana, see n. 2 *supra*), and upon marriage, his wife by operation of law would take a Louisiana domicile even though she never resided in Louisiana, and it is unfair that because she is a woman her husband's domicile does not follow hers. While we are sympathetic to petitioner's feelings, she obviously, however, cannot argue that the husband's domicile should automatically follow the wife's for this would present the same constitutional infirmity petitioner contends exists now. See *Succession of McKenna*, 23 La. Ann. 369 (1871).

months of each year were spent with Eric in England. In such circumstances, the couple's principal residence was England, even if petitioner did not consider England her home. Therefore, even if Louisiana adopted a "facts and circumstances" test to determine matrimonial domicile, such domicile would be England.[6]

Finally, petitioner contends that the deficiency notice itself is void since it was issued to petitioner only because she was a woman and that it is, therefore, unconstitutionally discriminatory. This, of course, is based upon her argument that the law requiring a wife's domicile to follow her husband's is unconstitutional. Since we did not reach the constitutional issue previously, having decided that even if petitioner had prevailed in her constitutional challenge, Louisiana law would either not provide Eric with half of her earnings or that England would be her domicile, the fact that petitioner failed to persuade us that her husband is entitled to the benefits of community property laws would not necessarily foreclose her argument that respondent discriminated against her on the basis of the alleged sexual distinction in the Louisiana statute in question.

We do not believe petitioner has actually shown that the deficiency notice was issued solely because she is a woman. But even assuming that she would not have been issued a deficiency notice if she had been a similarly situated male, we do not believe the deficiency notice is null and void. Except in very limited circumstances involving allegations of extraordinary misconduct, we have consistently refused to look behind a deficiency notice to examine respondent's procedures or policies used in making the determinations. *Estate of Brimm v. Commissioner*, 70 T.C. 15, 22 (1978); *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327–329 (1974); *Human Engineering Institute v. Commissioner*, 61 T.C. 61, 66 (1973). See also *Rose v. Commissioner*, 70 T.C. 558 (1978).

In *Suarez v. Commissioner*, 58 T.C. 792, 814 (1972), we noted that "Where infringements of Constitutional rights are in-

---

[6]The traditional concept of matrimonial domicile is much more limited. The cases and commentators require that the wife need not take the husband's domicile at the time of marriage if the husband intends to acquire a new domicile. More broadly, the matrimonial domicile is the place to which the parties intend at the time of their marriage to make their home, and to which they move within a reasonable time. See *Ford's Curator v. Ford*, 2 Mart. N.S. (La.) 574, 14 Am. Dec. 201 (1824). This is particularly true where the spouses marry in a jurisdiction for purposes of convenience. It is clear that the traditional matrimonial domicile would not be Louisiana under the facts here.

volved, * * * a statutory notice should be carefully scrutinized and that some sanction should be imposed to discourage the Commissioner's use of and reliance on constitutionally inadmissible evidence." We held that respondent had to present evidence free of unconstitutional taint in support of the deficiency and, since the deficiency notice was based entirely upon inadmissible evidence, respondent had the burden of going forward with the proof. But we did not declare the notice a nullity.

We hold that the notice of deficiency is also not void in the present case. We do not believe respondent must administratively determine a State law's constitutionality, at least where it is not unconstitutional on its face, before issuing a notice of deficiency. Cf. *Davis v. Commissioner*, 65 T.C. 1014, 1021–1023 (1976); *Teichgraeber v. Commissioner*, 64 T.C. 453, 456 (1975).[7]

*Decision will be entered under Rule 155.*

[7]Where the exercise of respondent's discretion under sec. 7805(b) is questioned, however, a showing of discriminatory treatment of taxpayers who are similarly situated will tend to show an abuse of discretion. *Dixon v. United States*, 381 U.S. 68, 79 (1965); *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180 (1957); *International Business Machines v. United States*, 343 F.2d 914 (Ct.Cl. 1965), cert. denied 382 U.S. 1028 (1966); *Weller v. Commissioner*, 270 F.2d 294 (3d Cir. 1959); *Goodstein v. Commissioner*, 267 F.2d 127 (1st Cir. 1959).