In re Michael F. SPARFVEN, Debtor.

No. 99–14615.

United States Bankruptcy Court,
D. Massachusetts.

July 25, 2001.

Barry Kusinitz, Providence, RI, for Debtor.

Charles Pisaturo, Jr., Providence, RI, Chapter 7 Trustee.

Andrew S. Richardson, Providence, RI, Trustee of Anton Knoll, Inc.

Thomas P. Quinn, Warren, RI, United States Trustee.

## MEMORANDUM ON OBJECTIONS TO DEBTOR'S CLAIM OF FLORI-DA HOMESTEAD EXEMPTION

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matters before the Court are: 1) the Objection of the Chapter 11 Trustee (the "Sparfven Trustee") to Debtor's Claim

of Exemptions;[1] and 2) the Objection of Andrew S. Richardson, Trustee of Anton Noll, Inc. (the "Anton Noll Trustee"),[2] to the Debtor's Claim of Exemptions (the "Objections"). Through their Objections, the Trustees assert that the Debtor, Michael F. Sparfven (the "Debtor" or "Mr. Sparfven"), is not entitled to claim Florida's homestead exemption for real estate owned jointly with his estranged spouse as he was not a domiciliary of that state as of the date of the filing of the bankruptcy petition or for a longer portion of the 180 days prior to the filing of the petition than he was a domiciliary in any other state as required by 11 U.S.C. § 522(b)(2)(A). The Debtor filed a reply to the Trustees' Objections, asserting that he qualifies for the homestead exemption pursuant to the provisions of Article X, § 4(a)(1) of the Florida Constitution and 11 U.S.C. § 522(b)(2)(A). Resolution of the Trustees' Objections requires this Court to decide whether the Debtor was domiciled in Florida during the 180 days prior to the petition date, or whether the Debtor was domiciled in Florida for a longer portion of that 180–day period than he was domiciled in Rhode Island. The issue is particularly important because, if the Debtor were domiciled in Florida prior to the commencement of his bankruptcy case, his election of the Florida homestead exemp-

tion will be valid, he will be able to protect his interest in valuable real estate with equity of over $1,000,000, and the Trustees' Objections must be overruled.

The Court issued a pretrial order, and the parties filed a Joint Pretrial Memorandum, which, among other things, set forth numerous agreed facts. The Court held a trial on the Objections on April 6, 2001, April 13, 2001, and May 18, 2001. Following the trial, the Court ordered the parties to file post-trial briefs. Based upon the agreed facts, the testimony and the documentary evidence, and, in accordance with the provisions of Fed. R. Bankr.P. 7052, the Court makes the following findings of fact and conclusions of law.

In addition to his Objection to the Debtor's claim of exemptions, the Anton Noll Trustee filed a Complaint seeking to impose a lien on the Debtor's Florida real estate. The Court scheduled a trial on the Complaint for April 6, 2001. At trial, however, the Anton Noll Trustee stated that in the event the Court decided to sustain either Trustee's Objection to the Debtor's claimed exemption, he did not intend to pursue his Complaint.

## II. FACTS

Mr. Sparfven is forty-seven years of age. He was born and raised in Rhode Island.

1. Michael Sparfven originally commenced the above-referenced case as a Chapter 11 case in the United States Bankruptcy Court for the Southern District of Florida on November 22, 1999. On Motion of the United States Trustee, and with the consent of the Michael Sparfven, the case was transferred to the United States Bankruptcy Court for the District of Rhode Island by order dated December 3, 1999. On December 13, 1999, Charles Pisaturo, Esq. was appointed Chapter 11 Trustee. The Debtor's Chapter 11 case was converted to a case under Chapter 7 on March 3, 2000, and Charles Pisaturo, Esq. was appointed Chapter 7 Trustee. Attorney Pisaturo has not amended his Objection to the Debtor's Claim of Exemption to reflect that he is pursuing his

Objection in his capacity as Chapter 7 Trustee. The contested matter relating to the Objections to the Debtor's exemption was assigned to this Court when Judge Votolato allowed the Debtor's motion for recusal.

2. The Debtor was the principal of Anton Noll, Inc. against which an involuntary Chapter 7 petition was filed. An order for relief entered in the Anton Noll, Inc. case on October 29, 1999, and Andrew S. Richardson was appointed the Chapter 7 Trustee. Sparfven and Company, Inc. owns 100% of the stock of Anton Noll, Inc. and the Debtor is the sole officer, director and shareholder of Sparfven and Company, Inc.

He attended high school in Providence, Rhode Island, although he did not graduate. He obtained a high school equivalency degree while in prison in the early 1980s serving a five year sentence for a 1983 felony conviction for conspiracy to commit bankruptcy fraud. Mr. Sparfven has taken several college courses at Roger Williams College in Bristol, Rhode Island, but he did not obtain a college degree. His entire family has always lived in Rhode Island. He has a son from a prior marriage who lives in Rhode Island. With the exception of a two year stint in Tampa, Florida from 1985 to 1987, the years spent in federal prison in the early 1980s, and the sporadic time spent in Florida in the years prior to the filing of his present bankruptcy petition, the Debtor has always lived Rhode Island. At the time of trial, the Debtor resided in North Providence, Rhode Island. He has a Rhode Island driver's license and has never obtained a Florida driver's license. The Debtor has never voted in Florida as a result of his felony conviction in 1983.

Since high school, Mr. Sparfven has been involved in a number of businesses with primary locations in Rhode Island. The Debtor is the 100% shareholder, and sole officer and director of Sparfven and Company, Inc., a Rhode Island corporation. It, in turn, is the 100% shareholder of Anton Noll, Inc. ("Anton Noll"), a New York corporation, which sold metal products. Sparfven and Company, Inc., purchased the stock in Anton Noll in August of 1997. From that time until the company failed in fall of 1999, Mr. Sparfven was its president and chief operating officer. It operated in Rhode Island, New York and Ohio. Mr. Sparfven considered himself the owner of Anton Noll, and he managed it on a full-time basis until September of 1999, when the company was placed into receivership. The Debtor is also the president of Plantations Co. and Quantum International Group.

From January of 1998 to September of 1999, Anton Noll, which maintained operating accounts at Citizens Bank in Rhode Island, issued checks and made wire transfers to Mr. Sparfven in the sum of $4,307,915.59. Anton Noll also is a Chapter 7 debtor, as the bankruptcy court issued an order for relief in that case in October of 1999. For purposes of this contested matter, the Debtor conceded that Anton Noll holds an unsecured claim against him individually.

The Debtor established an estate plan in 1990 and was represented by Rhode Island attorneys. The Debtors' accountant and the accountant for his corporations has been, at all material times, the firm of Dacey & Guarino, a Rhode Island accounting firm. For a number of years, the Debtor has maintained a brokerage account at Charles Schwab's office in Providence, Rhode Island. Moreover, the Debtor owned investment property in Rhode Island, namely, a condominium in Bristol, Rhode Island which he rented.

Approximately eight months before he acquired Anton Noll through Sparfven and Company, Inc., Mr. Sparfven, in December of 1996, married his second wife, Dana M. Sparfven ("Mrs. Sparfven"). Mrs. Sparfven was also born and raised in Rhode Island. She attended the University of Southern Florida and the University of Rhode Island, but did not obtain a degree. At the time of their marriage, the couple resided in a condominium located on Oyster Pond Road in Warren, Rhode Island, which Mr. Sparfven had purchased in 1990 and in which he resided at the time of the marriage.

The Sparfvens had checking accounts at Citizens Bank in Rhode Island and at Slades Ferry Bank in southeastern Massachusetts, in close proximity to the Rhode

Island border. The Debtor and his wife maintained a joint checking account at Citizens Bank. In addition, Mrs. Sparfven had her own account at Citizens Bank. The Debtor testified that beginning in 1998 he established checking accounts with Florida banks, namely, Harris Bank and Trust and First Bank & Trust. Since April of 1999, the Debtor has maintained an IRA account with Harris Bank in Palm Beach, Florida, containing a balance of approximately $2,000. Mr. and Mrs. Sparfven also maintained a joint investment account at the Providence, Rhode Island office of Dean Witter, Reynolds, Inc. As of December 31, 1997, the account had a total asset value of $56,447.47. In January of 1998, the couple sold approximately $54,000 in stock from the Dean Witter account to fund the deposit for the purchase of a home in Vero Beach, Florida.

In late 1997, the Sparfvens decided to buy a house in Florida. According to the Debtor, they planned on having children and moving to Florida permanently. The couple retained the services of a Florida real estate broker to assist them in finding a suitable property. On Christmas day, 1997, Mrs. Sparfven advised her husband that she was pregnant. While investigating the community of Vero Beach, she also began looking into exclusive schools for children.

In December of 1997, the Sparfvens made a $1.2 million offer on a waterfront home located at 660 Reef Road, Vero Beach, Florida (the "Vero Beach property"),[3] which offer was accepted. The Sparfvens acquired title to the Vero Beach property on January 12, 1998. According to Mrs. Sparfven, the couple decided to purchase the Vero Beach property because they wanted to enjoy a home in a warm weather climate.[4] She further stated that they intended to live in Vero Beach for most of the year and in Rhode Island for the balance of the year. She indicated that the Vero Beach property was not a vacation home.

The Debtor and his spouse cobbled together the purchase price for the Vero Beach property. By check dated December 11, 1997, drawn on their joint Citizens Bank account, the Sparfvens paid $59,000 to Norris Real Estate as part of the deposit. On January 8, 1998, they arranged for a wire transfer in the sum of $52,500 from the same account to Coastal Escrow Services, Inc. in Florida. On January 9, 1998, Anton Noll wire transferred $50,000 from one of its bank accounts to Coastal Escrow Services. On January 12, 1998, the date of the closing, the Sparfvens wire transferred $100,000 from their joint Citizens Bank account to Coastal Escrow Services, Inc. Additionally, on January 12, 1998, the Sparfvens granted a mortgage on the Vero Beach property to the First National Bank and Trust Company of the Treasure Coast to secure a $960,000 loan. The monthly mortgage payments were in the approximate sum of $8,695, and the annual real estate taxes were $17,000. At the time they acquired the Vero Beach property, the Sparfvens did not record a declaration of homestead.

Less than one month before obtaining title to the Vero Beach property, in December of 1997, the Debtor entered into a purchase and sale agreement for the sale of his Warren, Rhode Island condominium. The condominium eventually sold for $410,000 on January 20, 1998, at which

---

3. The parties agreed that the Vero Beach property is located outside the municipality of Vero Beach, Florida.

4. Mrs. Sparfven did not testify at the trial. The parties agreed to introduce portions of her deposition transcript as her trial testimony. These were read into the record.

time the Sparfvens moved their possessions to Florida. According to the Debtor, the couple transported their motor vehicles to Florida at this time. Following the sale of the Warren condominium, Mr. & Mrs. Sparfven lived in the Vero Beach property for approximately five months, from January of 1998 to May of 1998. During this time Mr. Sparfven managed Anton Noll from the Vero Beach property through daily telephone and facsimile communications with its Rhode Island personnel. He also frequently traveled to Rhode Island to do business. Although he communicated with a broker about finding office space in Vero Beach, Florida, Mr. Sparfven did not procure office space in Florida for any of his businesses.

The Debtor testified that in January 1998 Mrs. Sparfven enrolled in Indian River Community College, but withdrew due to her pregnancy, which ended in a miscarriage. In early 1998, the Sparfvens joined the Indian River Country Club in the Vero Beach area, although Mr. Sparfven maintained his membership in the Crestwood Country Club, located in Rehobeth, Massachusetts, a community near the Rhode Island border. On March 19, 1998, Mrs. Sparfven registered to vote in Florida, although she never did so. She also obtained a Florida driver's license. Mrs. Sparfven used the Vero Beach address as her return address on correspondence and obtained return address stickers reflecting the Vero Beach property as the couple's address. In April of 1998, Mrs. Sparfven joined the Indian River Junior League.

Almost immediately after buying the Vero Beach property, the Sparfvens decided to list the property for sale. They entered into a exclusive listing agreement with Norris & Company Real Estate giving the agent the exclusive right to sell the Vero Beach property for $1,500,000 through January of 1999. According to

Mr. Sparfven, the reason for selling the property was that it needed major renovations.

The Debtor testified that the couple decided to return to Rhode Island for the summer of 1998. He testified that in June of 1998, he and his wife leased property at Gooseneck Cove, Newport, Rhode Island and lived in Rhode Island from June to September, 1998. During the summer of 1998, Mrs. Sparfven opened an antique business in Newport, Rhode Island at Brown & Howard Streets. Mrs. Sparfven operated the antique business for approximately eight months, following which it was closed and its contents were auctioned.

Mr. Sparfven recounted that shortly after listing the Vero Beach property for sale, in the late summer or early fall of 1998, the couple changed their minds about selling it and decided to renovate it instead. They hired a builder, Banov & Associates, in the spring of 1999, just over a year after buying the property. The builder estimated the cost of improvements to be $513,0000. According to the Debtor, the couple decided to make substantial improvements to the property because "they intended to spend the rest of [their] lives there." The Debtor testified about the couple's life plan, which was to summer in Rhode Island and to winter in Florida.

The funds utilized for making the renovations to the Vero Beach property came from Anton Noll's accounts. On various dates between January 14, 1999 and March 30, 1999 Anton Noll wire transferred the total sum of $286,500 to the Sparfvens' Florida contractor, Mr. Banov, as payment for renovations to the Florida property. The total cost for the renovations came to $517,783.73, of which at least $316,500 was paid by Anton Noll. Following the completion of the renovations in

March of 1999, the couple moved back into the Vero Beach property. According to the Debtor, from January of 1999 to March of 1999, they rented an apartment in Vero Beach so that they could visit and supervise the renovations because the house was not habitable.

The Debtor testified that the couple resided in their newly renovated home from March to May of 1999. According to Mrs. Sparfven, they moved back to Vero Beach in April of 1999.

On November 14, 1998, the Debtor entered into a six month lease of a condominium located at 24 Pope Street, Newport, Rhode Island with a term beginning on December 7, 1998 and ending on June 30, 1999. The couple indicated on the lease that their addresses were "3 Gooseneck Cove, Newport, RI and 660 Reef Road, Vero Beach, FL." The monthly rent for the Pope Street condominium was $3,000. Thus, from December of 1998 through June of 1999, the Sparfvens resided on Pope Street in Newport, Rhode Island.

In October of 1998, before the Sparfvens moved into their Newport condominium, their accountant, Dacey Guarino & Company, sent them 1997 federal income tax returns and 1997 state income tax returns for New Jersey, New York and Rhode Island. The Debtor and Mrs. Sparfven, on October 15, 1998, signed and filed a federal tax return for calendar year 1997, listing their residence as 660 Reef Road, Vero Beach, Florida. The Debtor explained that the couple filed a Rhode Island state tax return for 1997 because they had a Rhode Island residence during that tax year. The couple did not file a Florida return as Florida has no income tax. The Debtor has not yet filed tax returns for 1998 and 1999.

On April 14, 1999, the Sparfvens' accountant filed an application for an extension of time to file 1998 federal and state (Rhode Island and New Jersey) tax returns, listing the couple's address as Vero Beach, Florida. On June 17, 1999, the IRS issued a notice of federal tax lien to the Sparfvens advising them of unpaid taxes for 1996 and 1997 in the sum of $231,649.07 and showing their residence as Vero Beach, Florida.

In June of 1999, the Debtor entered into an Asset and Real Estate Purchase Agreement for the purpose of acquiring a zinc alloy and metal fabrication business in Ohio. In the agreement, the Debtor gave his address as 2310 Pawtucket Avenue, East Providence, Rhode Island, which was the address of Anton Noll's headquarters. According to the Debtor's assistant, the office address was provided for convenience. In connection with the transaction, the Debtor was represented by the Rhode Island law firm of Cameron & Mittleman, LLP.

On June 21, 1999, the Debtor executed a lease for an apartment at 12 Keene Street in Providence, Rhode Island for a one year term beginning on August 2, 1999 and ending on July 31, 2000. The Debtor testified that this apartment was to be occupied solely by his wife as the couple had separated. He stated that he rented the property for her so that the couple's dogs could live with her and that his wife moved into the apartment in July. Mrs. Sparfven, however, was not a party to, or even mentioned in the lease. Indeed, the lease provided that Mr. Sparfven was to occupy the premises and that no pets were allowed without the landlord's prior written consent. There was no evidence that the landlord consented to pets. In addition, the lease included parking spaces for two automobiles.

One week after leasing the Keene Street apartment, the Debtor, on June 30, 1999, executed a lease for an apartment known

as Unit 207, Corliss Landing, 555 South Main Street, Providence, Rhode Island for a term of 11.5 months beginning on July 1, 1999 and ending on June 15, 2000 for the sum of $950 per month. The lease listed the Debtor's address as "2310 Pawtucket Ave, East Providence, RI." The Debtor testified that he moved into this apartment on July 1, 1999.

Initially, on direct examination, the Debtor testified that he separated from his wife in July of 1999. On cross examination, however, the Debtor could not recall the month or the date of their separation. Thereafter, he testified that the separation took place in mid-June of 1999. Mrs. Sparfven also testified that the couple separated in June or July of 1999. Like Mr. Sparfven, she could not recall the exact date or whether they agreed to separate in Rhode Island or Florida. The Debtor testified that he went back to Vero Beach in mid-July for several weeks to contemplate his marriage. During that time, the Debtor, on August 2, 1999, registered his Mercedes in Florida.[5]

On August 5, 1999, Mrs. Sparfven filed a complaint for divorce in the Family Court in Providence, Rhode Island.[6] In the divorce action, the Debtor is represented by Attorney Robert Flaherty from Providence, Rhode Island. Although the Family Court has entered several orders, the orders were not introduced into evidence.

In August of 1999, the Sparfvens rented the Vero Beach property to a tenant, James Richardson, for three months for the sum of $40,000 per month. According to the Debtor, the couple did not list the property with a real estate agency. Rather, they were approached by a broker, and

they accepted the tenancy due to the substantial rent offered by Richardson.

Despite their testimony that they had agreed to separate and rent separate apartments in Providence, the Sparfvens, on August 19, 1999, made an offer to buy real estate on South Water St. in Providence, Rhode Island for the sum of $275,000. In August and September of 1999, they made a series of deposits through a relative, Anthony Thomas for the South Water Street property. On September 9, 1999, Mrs. Sparfven executed a purchase and sale agreement for the sum of $279,000. According to the Debtor, the transaction did not go forward because the couple was unable to acquire an adjacent lot, which was a condition of the purchase and sale agreement. The Debtor did not explain why his wife and he were attempting to acquire property after their separation and after the divorce action was commenced, although the evidence established that in September of 1999, the couple reconciled briefly. During that short time, they resided at the Keene Street apartment, and Mr. Sparfven subleased the Corliss Landing apartment.

In the late summer of 1999, the Debtor asked his attorney in Florida to prepare a deed transferring his ownership interest in the Vero Beach property to Mrs. Sparfven, thus providing her with a 100% ownership interest. Indeed, he executed a deed dated September 3, 1999. The Debtor testified that Mrs. Sparfven requested the transfer and that he agreed to it to ensure her financial security. Mrs. Sparfven, however, testified that it was Mr. Sparfven's idea to put the Vero Beach property in her name as he wanted to reconcile and

---

5. On November 18, 1999, the Debtor altered his automobile insurance coverage to include coverage for his Mercedes. The policy cover sheet listed his address as the Vero Beach property.

6. The divorce action has been stayed pending the bankruptcy case and has not proceeded past the initial stages.

prove his love. Nevertheless, the Debtor concluded that the couple should go their separate ways and changed his mind about transferring his interest in the Vero Beach property to her. He testified that Mrs. Sparfven questioned his commitment and that he was concerned about her alcohol abuse. Although the Debtor represented to his wife that he sent the deed to Florida to be recorded, he directed his attorney not to record the deed. When their reconciliation failed, Mrs. Sparfven moved to Jamestown, Rhode Island.

In November of 1999, Mr. Sparfven testified that he visited the Vero Beach property to inspect it after the lease terminated. He stayed in Florida for approximately 10 days and then returned to Rhode Island to respond to litigation at his attorney's direction. On November 19, 1999, the Debtor listed for sale his investment condominium in Bristol, Rhode Island that he had owned individually since 1990. On the listing agreement and on a purchase and sale agreement for the condominium, the Debtor gave his address as One Washington Plaza, Providence, Rhode Island, which was his office address.

On November 22, 1999, the Debtor filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Southern District of Florida. On the next day, the Debtor registered an additional vehicle, a "Land" [sic] in Florida. The registration certificate reflects the Vero Beach address. In his bankruptcy case, on Schedule C–Property Claimed Exempt, the Debtor claimed the Vero Beach property as exempt under Article X, § 4(a)(1) of the Florida Constitution.

The Debtor testified that he went back to the Vero Beach property in January of 2000 and remained there for several weeks. Sometime in January, he agreed with his wife that she could occupy the Vero Beach property for a month and that he would return to Providence. In early 2000, Mrs. Sparfven obtained a restraining order against the Debtor, and he has lived in Rhode Island ever since. As of the date of her deposition, Mrs. Sparfven occupied the Vero Beach property and had a job paying $32,000 per year. She has not paid the mortgage on the Vero Beach property and has paid only the electric and pool service bills. At the time of her deposition, Mrs. Sparfven testified that she intended to live in Florida permanently. Moreover, since her deposition, she has entered into an agreement with the Anton Noll Trustee which provides that she will relinquish any interest she has in the Vero Beach property in exchange for a cash payment.

In an appraisal report dated March 18, 1999, Donald F. Defentheler of Pardue, Heid, Church, Smith Waller, Inc. expressed an opinion that the Vero Beach property had a value of $2,300,000. In an appraisal report dated March 13, 2000, Peter D. Armfield expressed an opinion that the Vero Beach property had a value of $2,100,000. In view of the outstanding mortgage on the property, the Sparfvens have approximately $1,000,000 in equity in the Vero Beach property.

The Debtor testified that he never discussed a homestead of the Vero Beach property with Mrs. Sparfven. He stated that he intends to occupy the Vero Beach property as his permanent residence if his exemption is allowed. He has not acquired any other real estate since the bankruptcy filing.

It is not clear how the Debtor has earned a living since the failure of Anton Noll. The Debtor testified that he intends to establish a sole proprietorship in Vero Beach Florida to engage in the business of "corporate intelligence." However, he has not taken any steps to establish a sole

proprietorship or to obtain employment in either Florida or Rhode Island.

Despite registering his automobiles in Florida, Mr. Sparfven never obtained a Florida driver's license. Sometime in 1999,[7] Mr. Sparfven noticed that he was driving in Rhode Island with an expired driver's license. He obtained a renewal of his Rhode Island driver's license effective through May of 2004, using the Warren, Rhode Island address even though that property had been sold in January of 1998 before the couple moved to Florida. The Debtor did not explain the reason for using the Warren, Rhode Island address when he no longer owned or lived in the property. Mr. Sparfven stated that he intended to get a Florida license but never got around to it.

To summarize the time spent by the Debtor and his spouse in Rhode Island and Florida, the Court finds that during 1998 and 1999, the Sparfvens lived sporadically in Florida. For most of those two years, they lived in Rhode Island in leased properties. The Sparfvens lived at the Vero Beach property from January of 1998 through May of 1998. Thereafter, they lived in Rhode Island in a leased apartment during the summer of 1998 and continued to live in Rhode Island during the fall of 1998 and the winter of 1999. They visited the Vero Beach property several times during the summer and fall of 1998 and in December of 1998. They rented an apartment in Vero Beach from January of 1999 to March of 1999 to enable them to supervise renovations to the Vero Beach property. They moved back to the Vero Beach property in early March of 1999 where they remained until May 1999.

They returned to Rhode Island for the summer of 1999 and separated in June of 1999.

With respect to the Debtor's motor vehicles, the evidence was equivocal. In answers to interrogatories dated June 16, 2000, the Debtor objected to and refused to provide information about the registration of vehicles prior to November 22, 1999. The Debtor introduced the Florida registration certificates for two vehicles, one dated August 2, 1999 for a "Merz" and the other dated November 23, 1999 (post-petition) for a "Land." Although the Debtor testified that the couple transported their motor vehicles to Florida in January of 1998, it is unclear whether they kept vehicles in Rhode Island for their personal use; whether the vehicles that the Debtor eventually registered in the months preceding the filing of his bankruptcy petition and on the day after the filing were the same vehicles he testified about transporting to Florida in January of 1998; or whether, as his testimony suggested, he leased a new vehicle in Florida and registered it there.

## III. DISCUSSION

### A. Applicable Law

■ This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151, and 157(a). This is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(B) and (J). Federal Rule of Bankruptcy Procedure 4003(c) places the burden of proof on the party objecting to an exemption claimed by the Debtor. The objecting parties have the burden of establishing that the Debtor is not entitled to the Florida homestead ex-

---

7. Mr. Sparfven did not testify as to the exact date that he obtained renewal of his license. Because R.I. Gen. Laws § 31–10–30 provides that a driver's license expires on the birthday of the licensee in the fifth year following the issuance of the license, and Mr. Sparfven's renewed license expires on May 12, 2004, the Court is able to deduce that the date was sometime in 1999 and after he sold the Warren property.

emption. *In re Lee*, 223 B.R. 594, 599 (Bankr.M.D.Fla.1998).

■■■ The commencement of a bankruptcy case creates an estate which is composed of all the debtor's legal and equitable interests in property. 11 U.S.C. § 541(a). Section 522(b) of the Bankruptcy Code permits a debtor to exempt property from the bankruptcy estate and allows a debtor to choose between federal and state exemption schemes, unless the state has "opted-out" of the federal scheme. Additionally, the debtor may choose exemptions under federal law, other than those under § 522(d), or "State or local law that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180–day period than in any other place." 11 U.S.C. § 522(b)(2)(A).[8]

■■ Article X, § 4(a)(1) of the Florida Constitution provides in pertinent part:

There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty, the following property owned by a natural person:

(1) a homestead . . . .

Art X, § 4(a)(1), Fla. Const. Although Florida's constitutional provision authorizing the homestead is not to be applied to make it an instrument of fraud, a homestead acquired by a debtor with the specific intent to hinder, delay, or defraud creditors is nonetheless protected under the Florida Constitution. *Havoco of America, Ltd. v. Hill*, 790 So.2d 1018 (Fla.2001). Under Florida law, a person desiring to obtain a homestead may make a statement in writing declaring the homestead and record it at the circuit court, however, recordation is not a requirement for homestead protection. *See* Fla. Stat. Ann. § 222.01.

■■ A debtor is considered domiciled in a state for the purposes of 11 U.S.C. § 522(b) if the evidence establishes that (1) the debtor was physically present in the state for the greater part of the 180–day period preceding the petition date than he was present in any other place; and (2) the debtor intends to remain in the state indefinitely. *In re Lowenschuss*, 171 F.3d 673, 683 (9th Cir.1999), *cert. denied*, 528 U.S. 877, 120 S.Ct. 185, 145 L.Ed.2d 156 (1999). *See Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989). The statute does not "permit prospective

---

**8.** Specifically, § 522(b)(2)(A) provides the following:

Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate the property listed in either paragraph (1) or, in the alternative, paragraph (2) of this subsection. . . . Such property is—
(1) property that is specified under subsection (d) of this section, unless the State law that is applicable to the debtor under paragraph (2)(A) of this subsection specifically does not so authorize; or, in the alternative,

(2)(A) any property that is exempt under Federal law, other than subsection (d) of this section, State or local law that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180–day period than in any other place. . . .

11 U.S.C. § 522(b).

bankruptcy debtors to maximize exemptions by temporarily changing their state of residence. Unlike the bankruptcy venue statute, 28 U.S.C. § 1408, which refers to domicile, residence, principal place of business, or principal assets, § 522(b)(2)(A) of the Bankruptcy Code refers to only 'domicile.'" *In re Arrol*, 207 B.R. 662, 664 (Bankr.N.D.Cal.1997)(citing *Holyfield*, 490 U.S. at 48, 109 S.Ct. 1597).

 "The term 'domicile' is defined as the relation which the law creates between an individual and a particular locality or country, and is the legal conception of 'home,' being derived from the Latin *domus*, which means 'home' or 'dwelling house.' Domicile is the place where a person has his fixed, true, and permanent home and principle establishment, and to which, whenever he is absent, he has the intention of returning." *In re Orso*, 219 B.R. 402, 415 (Bankr.M.D.La.1998), *rev'd on other grounds*, 214 F.3d 637 (5th Cir. 2000), *reh'g en banc granted*, 242 F.3d 534 (5th Cir.2001)(quoting Black's Law Dictionary 435 (5th ed.1979))(footnote omitted). "Domicile" means more than mere residence; it is that place where a person has a permanent home and an intention of returning. Domicile is established by "physical presence in a place ... with ... intent to remain there." *Holyfield*, 490 U.S. at 48, 109 S.Ct. 1597. "It is the place where one intends to return when one is absent and where one's political rights are exercised. Mere physical removal to another jurisdiction without the requisite intent is insufficient to effect a change of domicile." L. King, *Collier on Bankruptcy*, ¶ 522.06, at 522–33–4 (15th ed. Supp. 2000). A domicile is a person's permanent residence and its determination is a function of intent and physical presence. *In re Hodgson*, 167 B.R. 945, 950 (D.Kan.1994). Changes in domicile also require the concurrence of two elements: 1) physical presence at the new location; and 2) an intention to remain there indefinitely, or the absence of any intention to go elsewhere. *In re Ring*, 144 B.R. 446, 449 (Bankr.E.D.Mo.1992).

 When a person has more than one residence, intent is particularly relevant. Intent is established by considering all circumstances, including the person's conduct and statements. *Hodgson*, 167 B.R. at 951. The question of intent is determined by the acts and statements of the person whose domicile is questioned. The United States Supreme Court has directed courts to consider several factors in determining domicile, including:

(1) current residence; (2) voting registration and voting practices; (3) location of spouse and family; (4) location of personal or real property; (5) location of brokerage and bank accounts; (6) memberships in churches, clubs, unions and other organizations; (7) location of a person's physician, lawyer, accountant, dentist and stockbroker; (8) place of employment or business; (9) driver's license and automobile registration; and (10) payment of taxes.

*Id.* at 950 (citing *District of Columbia v. Murphy*, 314 U.S. 441, 455–58, 62 S.Ct. 303, 86 L.Ed. 329 (1941)).

 "Intent is proven by the actual state of facts and not what one declares them to be." *Orso*, 219 B.R. at 416. Statements of intent are not controlling. *Ring*, 144 B.R. at 449. "One's testimony with regard to his intention is of course to be given full and fair consideration, but is subject to the infirmity of any self-serving declaration, and may frequently lack persuasiveness or even be contradicted or negatived by other declarations and inconsistent acts." *Murphy*, 314 U.S. at 456, 62 S.Ct. 303.

The determination of a debtor's domicile for the purposes of § 522(b)(2)(A) is a question of federal law because one of the central purposes of bankruptcy laws is uniformity of application. *Hodgson*, 167 B.R. at 950. Because state court decisions on the issue of domicile utilize the same concept of domicile as that used in § 522(b)(2)(A), however, state court decisions are instructive. In *DeBlois v. Clark*, 764 A.2d 727 (R.I.2001), the Supreme Court of Rhode Island considered whether taxpayers, who were long-time Rhode Island residents and who retired to and spent significant time in Florida, were no longer liable for income taxes because they changed their domicile to Florida. The Court ruled that even though they continued to retain ties to and maintain a residence in Rhode Island the taxpayers were domiciled in Florida because the evidence of their intent and their objective manifestations of intent compelled the conclusion that they intended to live in Florida permanently. Thus, the determination of domicile must be made on a case by case basis upon consideration of all the evidence. *McCarthy v. McCarthy*, 45 R.I. 367, 370, 122 A. 529, 531 (1923).

### B. *Analysis*

Applying these principles to the facts of the present case, the Court finds that Trustees have sustained their burden of demonstrating that the Debtor is not entitled to claim the Florida homestead exemption because he was not domiciled in Florida for the entire 180–day prepetition period and was not domiciled in Florida for the longer portion of that period than in any other place.

The Debtor's domicile was clearly in Rhode Island prior to the Sparfvens' move to Florida in January of 1998. Mr. Sparfven was born and raised in Rhode Island and lived his entire life there with certain limited exceptions. The Debtor's entire family lives in Rhode Island, including his parents, siblings, only child, and other relatives. The major events in his life have occurred in Rhode Island. He attended school in Rhode Island, twice married in Rhode Island, and operated various businesses in Rhode Island. Thus, the issue is whether the Debtor changed his domicile to Florida.

The evidence compels the conclusion that the Debtor did not change his domicile to Florida when he purchased the Vero Beach property in January of 1998. Although the Debtor expressly declared that he intended Florida to be his domicile after January of 1998, his self-serving statement of intent is not controlling, *Murphy*, 314 U.S. at 456, 62 S.Ct. 303, and the events and circumstances after January of 1998 are inconsistent with his statement of intent. The Debtor took numerous actions from January of 1998 to the date of the filing of his bankruptcy petition that are contrary to his claim of a Florida domicile during that period. The Trustees have introduced sufficient evidence to refute the Debtor's self-serving assertion that he changed his domicile from Rhode Island to Florida.

The Court rejects Mr. Sparfven's statement of intent as controlling the outcome of the Trustees' Objections. The purchase of the Vero Beach property was simply a change of residence and was not intended to be a change of domicile. The sale of the Warren, Rhode Island property was not an abandonment of the Debtor's domicile in Rhode Island, as Mr. Sparfven and his wife leased several properties in Rhode Island and even made an offer to purchase real estate for the purposes of residing in Rhode Island after acquiring the Vero Beach property.

It is clear from Mr. Sparfven's actions from January of 1998 until the commence-

ment of the bankruptcy case that he did not intend to change his Rhode Island domicile in favor of Florida. In particular, the Debtor continued travel to and from Rhode Island; he maintained business, personal and professional ties to Rhode Island; and he maintained residences in Rhode Island. In short, he sporadically occupied the Vero Beach property. The Court finds Mr. Sparfven's decision to continue doing business in Rhode Island to be especially significant. Although he did some work from his home in Florida, Anton Noll's operations remained the same before and after the Debtor's asserted change of domicile. Although the Debtor testified that he looked for office space in Vero Beach, he did not move the business to Florida and continued to travel frequently to Rhode Island to supervise Anton Noll's operations.

After his supposed change of domicile, Mr. Sparfven continued to use the services of various professionals based in Rhode Island, including accountants and attorneys. He employed Florida attorneys for particular transactions only, namely the purchase of the Vero Beach property and the bankruptcy filing. Although Mr. Sparfven opened several bank accounts in Florida, he continued to maintain his primary bank accounts in Rhode Island. Most importantly, he used Anton Noll's Rhode Island bank account to fund many of his personal expenses.

The Debtor neither transferred his car insurance nor changed his vehicle registrations when he moved to Florida in 1998. He did not change them until late 1999, just prior to the date of the filing of his bankruptcy petition, which renders the change suspect. The Debtor never obtained a Florida driver's license and instead chose to renew his Rhode Island license sometime in 1999, after his alleged change of domicile. Indeed, the Court finds that the Debtor's renewal of his license using an address for a property that he had sold undermines his credibility.

The Debtor held himself out to third parties as a domiciliary of Rhode Island. He listed Providence, Rhode Island as his address on various contracts and leases. Although the Debtor did join a country club in Florida, he continued to maintain his membership in a country club in close proximity to Rhode Island. Although Mrs. Sparfven changed her driver's license to Florida, registered to vote there, and joined social organizations in Vero Beach, the Debtor's domicile, not Mrs. Sparfven's, is the issue in this case.

Most importantly, during the majority of the time period when he claims he was domiciled in Florida, the Debtor lived primarily in Rhode Island. The Debtor only lived in the Vero Beach property during short periods between January and May of 1998 and March and May of 1999. Significantly, within a month after purchasing the Vero Beach property, the Debtor listed it for sale with a broker for a one year listing period. Although the Debtor professed that he was discouraged by the estimates he obtained for renovations to the property, he did not remove the property from the market after the repairs were done. Within several months after the move to Florida, he entered into a lease of a Rhode Island apartment. Thereafter, the Sparfvens continued to rent apartments so that they could live in Rhode Island, merely visiting the Vero Beach property sporadically. During the 180 day period before he filed his bankruptcy petition, the Debtor spent only several days in Florida. In June of 1999, when he and Mrs. Sparfven separated, the Debtor returned to Rhode Island. Indeed, the Debtor and his wife leased the Vero Beach property to a third party from August to November of 1999. Moreover, the

Debtor came very close to deeding the property to Mrs. Sparfven in September of 1999. Curiously, after the commencement of the divorce action, the Sparfvens made an offer to buy property in Rhode Island, which, according to the Debtor, was to serve as their residence. These facts are inconsistent with the Debtor's claim of a Florida domicile.

■ Mrs. Sparfven's actions also undermine the Debtor's assertion of a change in his domicile. Significantly, when Mrs. Sparfven filed the divorce action, she commenced the case in the Family Court in Rhode Island. Under Rhode Island law, in order to file a complaint for divorce, a plaintiff must be domiciled in Rhode Island. *See* R.I. Gen. Laws § 15–5–12. The docket in the divorce action reflects that Mr. Sparfven did not request dismissal of the action for lack of jurisdiction.

The Court finds that during most, if not all, of the 180–day period before the commencement of the case (June through November of 1999) the Debtor was domiciled in Rhode Island. The Trustees have sustained their burden of establishing that the Debtor was not domiciled in Florida or domiciled in Florida for a longer period of the 180–day period than in any other place.

## IV. CONCLUSION

For the above-discussed reasons, the Court sustains the Objections to the Debtor's Homestead Exemption.